**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| BEAVER COUNTY EMPLOYEES' RETIREMENT FUND; ERIE COUNTY EMPLOYEES' RETIREMENT SYSTEM; and LUC DE WULF, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TILE SHOP HOLDINGS, INC.; ROBERT A. RUCKER; THE TILE SHOP, INC.; TIMOTHY C. CLAYTON; PETER J. JACULLO III; JWTS, INC.; PETER H. KAMIN; TODD KRASNOW; ADAM L. SUTTIN; WILLIAM E. WATTS; ROBERT W. BAIRD & CO. INCORPORATED; CITIGROUP GLOBAL MARKETS INC.; CJS SECURITIES, INC.; HOULIHAN LOKEY CAPITAL, INC.; PIPER JAFFRAY & CO.; SIDOTI & COMPANY, LLC; TELSEY ADVISORY GROUP LLC; and WEDBUSH SECURITIES, INC.,<br><br>Defendants. | Civil No. 0:14-cv-00786-ADM-TNL<br><br>**THE TILE SHOP DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |

Date: October 27, 2014.

**FAEGRE BAKER DANIELS LLP**
Wendy J. Wildung (#117055)
Justin P. Krypel (#0389385)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000
Fax: (612) 766-1600

*Attorneys for Defendants Tile Shop Holdings, Inc., Robert A. Rucker, The Tile Shop, Inc. and Timothy C. Clayton*

## THE TILE SHOP DEFENDANTS' REPLY MEMORANDUM

In their brief ("Pls' Br.") in opposition to the Tile Shop Defendants' motion to dismiss the Consolidated Amended Complaint ("Complaint"), Plaintiffs overstate their own factual allegations, misapprehend the law, and continue to proffer speculative, conclusory allegations that find no basis in any facts alleged. Plaintiffs fail to meet the strict pleading standards of the PSLRA and, therefore, their Complaint should be dismissed.

### I. BP Was Not A Tile Shop Supplier.

The allegations in the Complaint contradict Plaintiffs' repeated assertion that BP was a Tile Shop supplier. As Plaintiffs allege, BP was not a supplier, it was a licensed export trading company. (Compl. ¶4 ("a Chinese export trading company").) As Tile Shop described in its 2013 10-K, "[t]he role of a licensed Chinese export trading company is to coordinate the export process on behalf of Chinese vendors, which includes processing export paperwork, managing registration of exports with the Chinese government, invoicing and receiving payments from the purchaser, and processing payments to sellers." (Wildung Aff. Ex. 13, at 48.)

Because BP was an export company and not a supplier, Plaintiffs cannot rely on BP to demonstrate that Tile Shop's statements about its suppliers and supply chain were false. This also makes all of Plaintiffs' arguments about BP's finances irrelevant to the question of whether Tile Shop's committed fraud.

The SAIC documents that Plaintiffs point to are similarly irrelevant. *First*, Plaintiffs do not plead facts sufficient to understand what the SAIC documents mean.

Plaintiffs assume that SAIC records follow accounting principles similar to U.S. GAAP and that financial "losses" recorded in them mean the same thing as in the United States. But there is no factual basis in the Complaint to support that assumption. *Second*, even if BP had losses, it does not mean that Nishi did not personally profit from his ownership of BP. For instance, it is possible that BP made operating profits, but Nishi opted to pay those profits out in salary to himself. The allegation that BP was unprofitable does not answer whether Nishi was receiving income from BP's operations. *Third*, Plaintiffs do not cite the SAIC documents themselves, nor have they provided them as exhibits. Instead, Plaintiffs point to the unreliable Gotham Report (*see* Outside Directors Reply Memo.), which cited SAIC documents. Without some explanation of the origins of the SAIC documents cited in the Gotham Report, and some indicia that they are reliable, the Court should not credit Plaintiffs' second-hand reference to them on a motion to dismiss. *See In re A-Power Energy Generation Sys. Ltd. Sec. Lit.*, MDL 11-2302-GW, 2012 WL 1983341 (C.D. Cal. May 31, 2012) (no explanation of origins or authenticity of SAIC filings).

## II. Plaintiffs Still Fail To Specify Any Actionable Statement Except The Nishi Omission.

Plaintiffs acknowledge that the Tile Defendants correctly identified the four broad categories of misstatements alleged in the Complaint. (Pls' Br. 32 n.18.) But this does not relieve Plaintiffs of their burden to articulate the specific statements they allege were false. Even in their 55-page opposition brief, Plaintiffs failed to meet this basic requirement. (*Compare* Defs' Br. 7-18 *with* Pls' Br. 32-33.) Nor have Plaintiffs

identified any pleaded facts that render any specific statement false or misleading. Plaintiffs plead no facts that contradict Tile Shop's general positive statements about its relationships with suppliers, or that demonstrate that Tile Shop's supply chain was weak.

Plaintiffs' argument that statements Tile Shop made about its lack of control of its suppliers were rendered false by the Nishi omission is not supported by the Complaint. There, Plaintiffs allege that "Tile Shop *or* Nishi" "had the ability to control, and did control" BP, NHS, Best Cheer Stone "and possibly other vendors." (Compl. ¶120.) But Plaintiffs make no allegations, beyond speculation, that Tile Shop actually controlled or worked *through* Nishi. (*Cf., e.g.*, Compl. ¶38 (FE1 asserting Nishi was a pawn); ¶131 (asserting Rucker "had control over major suppliers" but providing no facts); ¶140 (same); ¶149 (same); ¶155 (same); ¶158 (same).) It does not follow that, simply because one of either Tile Shop ***or*** Nishi allegedly "had the ability to control" BP, *both* had such ability.

Similarly, Plaintiffs still have not identified anything about Tile Shop's gross margin statements that was false. The actual numbers themselves were not inflated, and Plaintiffs plead no facts to the contrary. (*See* Wildung Aff. Ex. 1 (no evidence Tile Shop overpaid or underpaid suppliers as a result of BP relationship).) Plaintiffs now appear to be claiming that Tile Shop's gross margins were misleading because Tile Shop was buying product through BP, which was owned by a related party. (Pls. Br. 41-42.) However, the mere fact that Tile Shop did business with BP and NHS, whether they are related entities or not, does not render Tile Shop's statements about gross margins false.

## III. Plaintiffs' Claim Based Upon The Zhangs Should Be Dismissed.

Plaintiffs do not challenge the Tile Shop Defendants' position that they had no duty to disclose that the Zhangs ever owned BP. (*See* Defs' Br. 9-11.) Moreover, the Zhangs owned BP from 2008 to 2011, when Tile Shop was not a public company. (Compl. ¶¶161, 164, 168.) Thus, the allegations about the Zhangs have no place in this action and should be dismissed.

## IV. Plaintiffs Have Not Identified Any Trend.

Plaintiffs' argument that Tile Shop had a duty to disclose its relationship with BP under Item 303 because Tile Shop received increasing amounts of product from BP from 2011 to 2013 is unpersuasive. Plaintiffs implicitly assume that Tile Shop's gross margins were inflated as a result of its relationship with BP. Otherwise, the alleged trend would create no disclosable "uncertainty." But, as explained previously (Defs' Br. 14), the Complaint contains no facts indicating that Tile Shop's gross margins were misstated. And there is no reason why Tile Shop should have concluded that its increasing use of BP as an export company was "reasonably likely" to impact its financial condition.[1]

Plaintiffs' allegations also fail because a violation of Item 303 cannot be the basis of a securities fraud claim. In a decision earlier this month, the Ninth Circuit joined the Third Circuit in holding that Item 303's disclosure duty is not actionable under Rule 10b-

[1] Because BP was an export trading company, not a supplier, Plaintiffs' assertion that "reasonable investors" would have wanted to know about Tile Shop's increasing use of BP does not match the allegations in the Complaint. (*See* Pls' Br. 35-36.) The Complaint contains no facts about trends or uncertainties related to Tile Shop's actual suppliers. Tile Shop could have continued to do business with all the same suppliers—at the same pricing levels—through a different export trading company.

5. *In re NVIDIA Secs. Litig.*, No. 11-17708, --F.3d--, 2014 WL 4922264, at *6 (9th Cir. Oct. 2, 2014); *Oran v. Stafford*, 226 F.3d 275, 287-88 (3d Cir. 2000). This is because the standards for disclosure under Item 303 and Rule 10b-5 "differ considerably," and "what must be disclosed under Item 303 is not necessarily required under the standard in" *Basic v. Levinson*, 108 S.Ct. 978 (U.S. 1988). *NVIDIA*, 2014 WL 4922264, *at* *7. Without some separate showing of a duty to disclose, Plaintiffs' allegations fall short.

## V. <u>Plaintiffs' Theory Of The Alleged Fraud Is Inconsistent And Implausible.</u>

Plaintiffs' scienter theory is that Nishi operated on behalf of Tile Shop to purchase BP and NHS and subsequently sell tile to the Company at artificially low prices designed to overstate margins and to thereby inflate the market price of Tile Shop stock. This theory is implausible for at least two reasons.

*First*, Nishi never profited from any alleged fraud on the market because he never exercised any of his stock options.[2] To the contrary, he forfeited them after Tile Shop fired him for not disclosing his ownership interest in BP. (Wildung Aff. Ex. 13, at 48.)

*Second*, Plaintiffs also allege that Nishi profited from "kickbacks" that went to himself and not to Tile Shop. (Compl. ¶164.) This allegation is inconsistent with the notion that Tile Shop was funding a fraudulent scheme under the table because the alleged kickbacks would actually erode, not improve, Tile Shop's margins. It also is inconsistent with the notion that Nishi was operating on behalf of Tile Shop.

---

[2] Plaintiffs argue that Nishi "received compensation" from Tile Shop for "his role in Tile Shop's scheme." (Pls' Br. 7.) Plaintiffs' citation, however, is to paragraph 169 of the Complaint, which merely alleges that Nishi received a normal salary for his job as Purchasing Supervisor at Tile Shop.

## VI. <u>Plaintiffs Do Not Plead Facts Showing That Rucker Knew Nishi Owned BP.</u>

There is no dispute that Rucker knew about the existence of BP. Plaintiffs, however, attempt to conflate knowledge of BP's existence, with knowledge that Nishi purchased BP in 2011 and NHS in 2010. They plead no facts indicating the latter, and the assumptions they wish the Court to make are unjustified.

### A. <u>Plaintiffs' argument that Rucker knew or "had access to" contrary information fails.</u>

The fact that Rucker was involved in sourcing does not mean that Rucker knew or had access to information about Nishi's ownership of BP. (Pls' Br. 11-16.) Nor does Rucker's knowledge that the Zhangs owned BP as of 2008, when it was first created. (Compl. ¶8.)

Plaintiffs' argument that Tile Shop could have simply looked up the SAIC records on BP misses the point. Plaintiffs plead no facts suggesting that Rucker ever had any reason to inquire about a change in the ownership structure of BP or to look up BP's SAIC records. Absent a duty to inquire, there is no basis to suggest that Rucker ought to have combed through Chinese regulatory records for ownership information about one of Tile Shop's many business partners. Furthermore, if Plaintiffs' allegations are correct, then anyone else could have looked up those same records. Thus, the records cannot constitute material *non-public* information.

None of the cases cited by Plaintiffs (Pls' Br. 11-14) hold that the mere availability of contrary information *somewhere* is enough to raise an inference of scienter. Rather, they hold that knowledge of contrary information *within a company* that

contradicts the company's public statements may raise an inference of scienter. *In re Navarre Corp. Secs. Litig.*, 299 F.3d 735, 746 (8th Cir. 2002) (inference may exist where defendants "made statements when they knew or had access to information suggesting these public statements to be materially inaccurate");[3] *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (where plaintiffs claim that defendants had access to contrary facts, plaintiffs "must specifically identify the reports or statements containing the information" and also noting that "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others").

Plaintiffs allege no facts that anyone at Tile Shop knew that Nishi had acquired BP. Nor do Plaintiffs give any reason why Rucker ought to have questioned the ownership of BP or investigated outside sources for ownership information.

Plaintiffs' related party disclosure cases (Pls' Br. 15-16) are not on point. In the first case, the related party connection was the CEO's son (a blood relative), not the more distant relation by marriage alleged here. *Brown v. China Integrated Energy*, 875 F. Supp. 2d 1096 (C.D. Cal. 2012).[4] In the other two cases, it was undisputed that the

---

[3] Plaintiffs' citation to *Cummings v. Paramount Partners, LP*, 715 F. Supp. 2d 880, 905 (D. Minn. 2010), is inapposite. There the court held that it was implausible that defendants, who owned an interest in the hedge fund at issue and owned the fund's exclusive broker-dealer, did not know the operations and historical performance of the fund. Here, Plaintiffs do not allege that Tile Shop or Rucker had any direct ownership interest in BP or NHS.

[4] The related party connections in the other two cases Plaintiffs cite were also much closer than is alleged here. *A-Power Energy*, 2012 WL 1983341 (CEO had ownership interest and was a director of related party); *China Valves*, 979 F. Supp. 2d at 409 (wife of 34% shareholder who established related party at company's request).

company was aware of the related party nature of the relationships at issue. The only question for those courts was whether or not the defendants' failure to disclose the related party relationships amounted to fraud. *In re A-Power Energy Generation Sys. Ltd. Sec. Litig.*, 2012 WL 1983341 (C.D. Cal. May 31, 2012); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395 (S.D.N.Y. 2013). Here, the missing link is the lack of facts indicating that Rucker knew that Nishi purchased BP from the Zhangs in 2011.

The information from the four FEs does not supply the missing link. None were employed by Tile Shop during the Class Period, and none have any information about Nishi's acquisition or ownership of BP. (Pls' Br. 23.)[5] Plaintiffs' cited cases merely stand for the unremarkable proposition that pre-class period information "may provide insight into what the defendant knew during the class period." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1222 (S.D. Cal 2010) (citation omitted). The pre-Class Period information of the FEs does not provide any insight here, because Nishi did not acquire NHS until 2010 or BP until 2011, years after the last FE left Tile Shop. (Compl. ¶164.)

Nor does the fact that Nishi was Rucker's brother-in-law provide the missing link. Plaintiffs' assertion that the two "were close" (Pls' Br. 16) is conclusory, and Plaintiffs

---

5 Plaintiffs claim that in *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, Your Honor refused to discredit information from pre-class period confidential witnesses. 2010 U.S. Dist. LEXIS 10029, at *11, 18. Plaintiffs overstate the Court's holding. The Court merely opted not to engage in a credibility determination on a motion to dismiss. *Id.* at *17-18. In that case, only 9 of the 15 confidential witnesses were pre-class period, *id.* at *11, and all of them had more or less the same information. *Id.* at *18. Here, *none* of the FEs were at Tile Shop during the Class Period.

do not allege that Nishi told Rucker about his purchase of BP and NHS, regardless of how close the relationship was between the two.

### B. Plaintiffs' "core operations" allegations fail.

Plaintiffs' "core operations" argument is not persuasive. Even if the doctrine existed in this Circuit—it does not—it would apply only to *Tile Shop's* core operations. The information that Plaintiffs attempt to attribute to Tile Shop—ownership of BP and NHS—goes to *BP's* and *NHS's* core operations. No case cited by Plaintiffs holds that companies such as Tile Shop or their executives are charged with knowledge of the core operations of one of the entities with which Tile Shop did business.

### C. Plaintiffs' "duty to monitor" allegations fail.

Plaintiffs' "duty to monitor" allegations fair no better. While it is true that scienter may be inferred where defendants "failed to check information they had a duty to monitor," *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003), Plaintiffs make no allegations that Rucker had a duty to monitor Chinese regulatory filings. The Complaint makes vague allegations that Rucker had a duty to monitor Tile Shop's supply chain, but that duty, even if it existed, cannot be said to extend to a duty to monitor the ownership of any company with which Tile Shop did business. That is especially true here, where the change in ownership at BP had no impact on Tile Shop's financial performance.

### D. Plaintiffs' allegations as to Rucker's supposed motive fail.

The timing and amount of Rucker's stock sales are not suspicious. Rather, they suggest that Rucker lacked a motive to commit fraud.

Plaintiffs define the Class Period as the *entire time* that Tile Shop was a public company prior to the conclusion of the Audit Committee investigation, roughly 17 months. Thus, *any* stock sales by Rucker would be inconsistent with his (nonexistent) past trading pattern. Courts are wise to this tactic, and recognize that insider stock sales during a lengthy class period are not very probative of scienter. *Teachers' Retirement Sys. Of LA v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (lengthy class period weakens any inference of scienter drawn from timing of defendants' trades); *In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (calling class period of roughly 15 months "unusually long").

Moreover, Rucker had a good reason to sell some of his shares when he did: it was the most expeditious way to grow Tile Shop's base of shareholders without having to authorize more shares. Plaintiffs, on the other hand, make no allegations that Rucker's stock sales occurred at particularly advantageous times or under any unusual circumstances. Rucker did not sell at or near the high (*see* Defs' Br. 25-27), and he retained 77% of his shares, even after his sales. *See In re Patterson Cos.*, 479 F. Supp. 2d 1014, 1034 (D. Minn. 2007) (no inference of scienter as to two executives and a director, who retained 97%, 89%, and 77% of their respective shares).

## VII. <u>Plaintiffs' Claim Against Tim Clayton Should Be Dismissed.</u>

Plaintiffs' only argument to keep Tim Clayton in this case is that he signed Sarbanes-Oxley ("SOX") certifications that turned out to be false. (Pls' Br. 30.) At most such allegation demonstrates falsity and, perhaps, negligence. But, Plaintiffs must do more than that. They must show that Clayton *knowingly* made a false SOX certification.

*In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008). Plaintiffs ignore binding Eighth Circuit precedent holding that a SOX certification that is later proven false is, standing alone, insufficient to plead scienter. *Id.*; *Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009). A contrary rule would eviscerate the PSLRA's heightened pleading requirements. *Ceridian*, 542 F.3d at 248.

The two district court cases that Plaintiffs cite do not hold otherwise. In *In re SemGroup Energy Partners, L.P. Sec. Litig.*, the district court merely listed numerous indicia of scienter, including false SOX certifications, without explaining the importance it attributed to any of them. 729 F. Supp. 2d 1276, 1298 (N.D. Okla. 2010). Similarly, in *In re ProQuest Sec. Litig.*, the court took "all of the allegations *together*, not singularly or in isolation" in order to find a compelling inference of fraud. 527 F. Supp. 2d 728, 745 (E.D. Mich. 2007) (emphasis in original); *see Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 120 (D.D.C. 2009) (noting that *ProQuest* does not support the position that a misleading SOX certification is alone sufficient to plead scienter).

Because Plaintiffs make no allegations against Clayton other he signed false SOX certifications, the claims against him should be dismissed. *See Horizon*, 580 F.3d at 761 (plaintiffs must "raise a strong inference of scienter for each defendant").

## VIII. <u>The 1933 Act Claims Should Be Dismissed.</u>

For the additional reasons set forth in the Underwriter Defendants' Reply Memorandum, which are hereby adopted in their entirety, the 1933 Act claims against the Tile Shop Defendants should also be dismissed.

## CONCLUSION

The Court should grant the Tile Shop Defendants' motion and dismiss all of the claims asserted against them with prejudice.

Date: October 27, 2014.

Respectfully submitted,

**FAEGRE BAKER DANIELS LLP**

s/ Wendy J. Wildung
Wendy J. Wildung (#117055)
Justin P. Krypel (#0389385)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000

*Attorneys for Defendants Tile Shop Holdings, Inc., Robert A. Rucker, The Tile Shop, Inc., and Timothy C. Clayton*

US.54996622.06