**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Beaver County Employees' Retirement
Fund; Erie County Employees' Retirement
System; and Luc De Wulf, Individually and
on Behalf of All Others Similarly Situated,

               Plaintiffs,

    v.

Tile Shop Holdings, Inc.; Robert A. Rucker;
The Tile Shop, Inc.; Timothy C. Clayton;
Peter J. Jacullo III; JWTS, Inc.; Peter H.
Kamin; Todd Krasnow; Adam L. Suttin;
William E. Watts; Robert W. Baird & Co.
Incorporated; Citigroup Global Markets Inc.;
CJS Securities, Inc.; Houlihan Lokey Capital,
Inc.; Piper Jaffray & Co.; Sidoti & Company,
LLC; Telsey Advisory Group LLC; and
Wedbush Securities, Inc.,

               Defendants.

**MEMORANDUM OPINION**
**AND ORDER**
Civil No. 14-786 ADM/TNL

_____

Matthew L. Mustokoff, Esq., Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Joseph
Russello, Esq., Robbins Geller Rudman & Dowd LLP, Melville, NY; Bryan L. Bleichner, Esq.,
Jeffrey D. Bores, Esq., and Karl L. Cambronne, Esq., Chestnut Cambronne, PA, Minneapolis,
MN, on behalf of Plaintiffs.

Wendy J. Wildung, Esq., Faegre Baker Daniels LLP, Minneapolis, MN; David Pearson, Esq.,
Winthrop & Weinstine, PA, Minneapolis, MN; Scott A. Edelman, Esq., Milbank Tweed Hadley
& McCloy LLP, New York, NY; Daniel J. Supalla, Esq., Briggs & Morgan, PA, Minneapolis,
MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

    On December 12, 2014, the undersigned United States District Judge heard oral argument

on Defendants Tile Shop Holdings, Inc., Robert A. Rucker, The Tile Shop, Inc., and Timothy C.

Clayton's (collectively, the "Tile Shop Defendants") Motion to Dismiss [Docket No. 81];

Defendants Peter J. Jacullo III, Peter H. Kamin, Todd Krasnow, Adam L. Suttin, William E.

Watts, and JWTS, Inc.'s Motion to Dismiss [Docket No. 86]; and Defendants Robert W. Baird & Co., Inc., Citigroup Global Markets Inc., CJS Securities, Inc., Houlihan Lokey Capital, Inc., Piper Jaffray & Co., Sidoti & Company, LLC, Telsey Advisory Group LLC, and Wedbush Securities, Inc.'s (collectively, the "Underwriter Defendants") Motion to Dismiss [Docket 90]. Beaver County Employees' Retirement Fund ("Beaver County"), Erie County Employees' Retirement System ("Erie County"), and Luc De Wulf (collectively, the "Plaintiffs") oppose the motion.  For the reasons set forth below, the motions are granted in part and denied in part.

## II.  BACKGROUND[1]

This securities class action seeks relief under the Securities Act of 1933 on behalf of all individuals who purchased Tile Shop Holdings, Inc. ("Tile Shop" or the "Company") common stock pursuant or traceable to the registration statements and prospectuses issued in connection with secondary public offerings on December 12, 2012 (the "December Offering") and June 5, 2013 (the "June 2013 Offering")  (collectively, the "Offerings").  Claims are also asserted under the Securities and Exchange Act of 1934 for those who purchased stock between August 22, 2012 and January 28, 2014 (the "Class Period").  All of  Plaintiffs' claims are generally premised on Tile Shop's failure to disclose related-party transactions and relationships.

This action is a consolidation of two cases originally filed in the United States District Court for the Southern District of New York that were transferred to the District of Minnesota on March 13, 2014.  Order Defs'. Mot. Transfer [Docket No. 42].  Pursuant to a consolidation order, a Consolidated Amended Complaint [Docket No. 66] ("CAC") was filed on May 23, 2014.

---

[1] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

## A.  Parties

Plaintiffs Beaver County, Erie County, and Luc De Wulf purchased Tile Shop common stock during the Class Period and were appointed as co-lead Plaintiffs on February 13, 2014 by the Honorable Katherine Polk Failla, United States District Judge for the Southern District of New York.  CAC ¶ 14; Order [Docket No. 35].

Tile Shop is a speciality retailer of manufactured and natural stone tiles, setting, and maintenance materials headquartered in Plymouth, Minnesota.  CAC ¶ 15.  As of October 1, 2013, Tile Shop operated 80 stores in 25 states.  Id.  Robert A. Rucker is—and was, at the time of the Offerings and throughout the Class Period—the Chief Executive Officer ("CEO"), President, director, and co-founder of Tile Shop.  Id. ¶ 16.  Rucker signed the registration statements issued with the Offerings.  Id.  The Tile Shop, Inc. ("TSI") is a Minnesota corporation wholly owned and operated by Rucker, who is its sole director and has sole voting and investment power in the securities it holds.  Id. ¶ 17.

Timothy C. Clayton is—and was, at the time of the Offerings and throughout the Class Period—Tile Shop's Chief Financial Officer ("CFO") and Senior Vice President.  Clayton also signed the registration statements issued with the Offerings.  Id. ¶ 18.  Together, Rucker and Clayton are referred to as the "Officer Defendants."

Peter J. Jacullo, Peter H. Kamin, Todd Krasnow, Adam L. Suttin, and William E. Watts are—and were at the time of the Offerings and throughout the Class Period—directors of Tile Shop who signed the registration statements issued with the Offerings.  Id. ¶¶ 19, 21-24.  Jacullo, Kamin, Krasnow, Suttin, and Watts are referred to as the "Director Defendants."

JWTS, Inc. ("JWTS") is a Delaware corporation wholly owned by Jacullo, who is its sole

director and may be deemed to have sole voting and investment power over the securities it

holds.  Id. ¶¶ 19-20.

Robert W. Baird & Co., Citigroup Global Markets Inc., CJS Securities, Inc., Houlihan

Lokey Capital, Inc., Piper Jaffray & Co., Sidoti & Company, LLC, Telsey Advisory Group LLC,

and Wedbush Securities, Inc. (collectively, the "Underwriter Defendants") are investment

banking firms that served as underwriters for the Offerings.  Id. ¶¶ 26-34.

## B.  Background Facts

### 1.  Tile Shop and Beijing Pingxiu

Tile Shop was co-founded by Rucker and Rodney Sill in or about 1985.  Id. ¶ 67.  Rucker

and Sill co-owned the Company until Rucker acquired Sill's interest in or around 2002.  Id. ¶ 41.

As CEO and President, Rucker claimed to be personally involved in establishing international

supplier relationships and sourcing materials for use in manufacturing Tile Shop products.  Id. ¶

176.  Rucker traveled to Turkey, China, and other locations.  Id. ¶¶ 40, 135.  According to a

former Tile Shop employee, Tile Shop's pre-Class Period CFO, Jim Beukelman, was responsible

for setting up foreign entities to serve as middlemen with vendors based in Turkey and China.

Id. ¶ 40.  According to the same former employee, sometime during 2002, Rucker's brother-in-

law, Fumitake Nishi, began working for the Company.  Id. ¶ 41.  Around this time, Rucker

tasked Nishi to scout vendors in China and they traveled to China together to negotiate with

sourcing vendors.  Id. ¶ 40.

Beijing Pingxiu ("BP"), a Chinese export trading company, was formed on March 3,

2008 and was at that time owned by Jian and Pan Zhang (together, the "Zhangs").  Id. ¶¶ 4, 43.

Jian is related through marriage to Rucker's wife and Pan, who is Jian's son, is Rucker's

nephew.  Id. ¶ 168.  As early as 2009, Tile Shop began receiving product from BP in China.  Id.

¶ 48.  Beginning in fiscal year 2011 and continuing until 2013, Nishi was employed as a

purchasing supervisor for Tile Shop.  Id. ¶ 169.

Late in 2011, Nishi purportedly acquired BP and Tile Shop began purchasing greater

amounts of product from BP.  Id. ¶ 43.  In fiscal year 2011, 8.3 percent of Tile Shop product sold

was purchased from BP.  Id.  This percentage grew to 32.2 percent in fiscal year 2013.  Id. ¶ 159.

In this time period, Nanyang Helin Stone Co. Ltd. ("Nanyang"), a Tile Shop vendor, also began

selling stone accessory products to Tile Shop.  Id.  ¶ 4.  Nishi owned a majority interest in

Nanyang.  Id. ¶ 164.  Tile Shop purchased $1.7 million, $2.1 million, and $2.8 million of product

from Nanyang in fiscal years 2011, 2012, and 2013, respectively.  Id. ¶ 164.

### 2.  The Offerings

Tile Shop began trading on the NASDAQ on August 22, 2012 under the ticker symbol

TTS.  Id. ¶¶ 83-85.  Interests in The Tile Shop LLC were exchanged for cash, promissory notes,

and 32 million shares of Tile Shop common stock.  Id. ¶ 85.  Tile Shop conducted the Offerings

to provide an opportunity for certain stock holders to cash out.  Id. ¶ 89.

On about November 28, 2012, Tile Shop filed a Form S-1 Registration Statement, which,

after amendment, was declared effective by the SEC on December 12, 2012.  Id. ¶ 103.  The

following day, certain selling stockholders, including Tile Shop executives and directors, sold

5.175 million shares of common stock at $15 per share to the public.  Id. ¶ 104.  Of these shares,

Rucker and TSI, Jacullo and JWTS, Suttin, and Watts sold 1,823,937 shares, in exchange for

$27,359,055 in gross proceeds.  Id. ¶¶ 105, 109.

On or about May 24, 2013, Tile Shop filed a Form S-1 Registration Statement, which,

after amendment, was declared effective by the SEC on June 4, 2013.  Id. ¶ 106.  Again, on the

following day, certain selling stockholders, including Tile Shop executives and directors, sold

4,887,500 shares of common stock at $24.25 per share to the public.  Id. ¶ 107.  Of these shares,

Rucker and TSI, Jacullo and JWTS, Kamin, and Krasnow sold 1,715,000 shares, for $27,359,055

in gross proceeds.  Id. ¶¶ 108-09.

**C.  The Gotham Report**

On November 14, 2013, Gotham City Research ("Gotham") published a report that

identified connections between Rucker, Nishi, Tile Shop, and BP that Tile Shop had not

previously disclosed.  Id. ¶¶ 159-61.  Gotham's report claimed that Tile Shop's margins and

profits were inflated and that its earnings were overstated due to favorable transactions between

the related parties.  Id. ¶ 160.  That same day, ostensibly in response to the Gotham report, Tile

Shop issued a press release announcing an investigation into its relationship with BP.  Id. ¶ 162.

The market reacted by Tile Shop's share price dropping by almost 39% on an unusually high

volume of trading.  Id. ¶ 163.

On January 28, 2014, Tile Shop filed a Form 8-K and an attached press release dated the

previous day with the SEC.  Id. ¶ 164.  The press release disclosed the general relationship

between Rucker and Nishi, and Tile Shop, BP, and Nanyang but denied that vendors were either

over or underpaid through these relationships.  Id.  The press release also stated a number of

steps the Company would or had already taken in response, including terminating Nishi's

employment.  Id. ¶ 165.  The press release claimed that Tile Shop's internal investigation did not

uncover any other related-party transactions requiring disclosure.  Id. ¶ 166.  Finally, the press

release stated that the Company would "file an amended Annual Report on Form 10-K for fiscal

2012, which will include disclosure of Mr. Nishi's previously unknown ownership interests in BP and Nanyang, and the salary paid to Mr. Nishi as a Company employee." Id.

On February 28, 2014, Tile Shop filed its annual report on Form 10-K. Id. ¶ 168. Here, for the first time, the other relationships between Rucker's family members and BP, and Nishi and another business involved with Tile Shop, Best Cheer Stone Group LTD ("Best Cheer Stone"), were publicly disclosed. Id.

**D. Claims**

Item 404 of Regulation S-K obligates public companies to disclose transactions with certain related parties, including the brother-in-law of a director or an executive, if the transaction exceeds $120,000. 17 C.F.R. § 229.404. Rule 4-08(k)(1) of Regulation S-X provides that "[r]elated party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows." 17 C.F.R. § 210.4-08(k)(1).

Plaintiffs assert three claims against various defendants arising from the Securities Act of 1933 (the "1933 Act"). The claims are all generally predicated on the non-disclosure of Nishi's relationships with BP and Tile Shop. First, Plaintiffs allege Tile Shop, the Officer Defendants, the Director Defendants and the Underwriter Defendants violated Section 11 because the Registration Statements for the Offerings were inaccurate and misleading. Id. ¶¶ 201-09. Second, Plaintiffs allege Tile Shop, TSI, the Officer Defendants, JWTS, Inc., and the Underwriter Defendants violated Section 12(a)(2) because the prospectuses included untrue statements of material fact and failed to disclose material facts. Id. ¶¶ 210-17. Finally, Plaintiffs allege TSI, JWTS, Inc., the Officer Defendants, and the Director Defendants violated Section 15 by their status as control persons of Tile Shop. Id. ¶¶ 218-23.

In addition, Plaintiffs assert two claims against various defendants arising from the Securities and Exchange Act of 1934 (the "1934 Act").  The factual predicate of these claims also arises from the non-disclosure of Nishi's involvement with BP and Tile Shop.  First, Plaintiffs allege Tile Shop and the Officer Defendants violated Section 10(b) and Rule 10b-5 for disseminating or approving false or misleading statements.  Id. ¶¶ 224-27.  Second, Plaintiffs allege the Officer Defendants, the Director Defendants, TSI, and JWTS violated Section 20(a) as controlling persons of Tile Shop.  Id. ¶¶ 228-31.

## III.  DISCUSSION

### A.  Motion to Dismiss Standard of Review

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.

A pleading must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

"But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

**B.  The 1934 Act**

Plaintiffs assert a Section 10(b) and Rule 10b-5 claim against Tile Shop and the Officer Defendants, and a Section 20(a) claim against the Officer Defendants, the Director Defendants, TSI, and JWTS.

**1.  Section 10(b) and Rule 10b-5**

Plaintiffs claim Tile Shop and the Officer Defendants disseminated or approved statements in SEC documents, press releases, and conference calls that they knew to be misleading by inclusion of misrepresentations and disregarded and failed to disclose material facts.  Tile Shop and the Officer Defendants argue that, with the one exception of failing to disclose Nishi's involvement, Plaintiffs have failed to identify any actionable misleading statements or omissions made by Tile Shop.  To the extent Plaintiffs identify the omissions of the Nishi relationship on the registration statements, Tile Shop and the Officer Defendants argue the claim fails due to lack of scienter.

Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, make it unlawful to use any manipulative or deceptive device or contrivance in connection with the purchase or sale of securities.  Rule 10b-5 further makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To proceed on claims under § 10(b) and

Rule 10b-5, four elements must be established:

> (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security.

In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 888 (8th Cir. 2002).[2]

### a.  Standard of Review

Section 10(b) and Rule 10b-5 claims are subjected to the heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA").  Private Securities Litigation Reform Act of 1995, 109 Stat. 737 (1995); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).  The PSLRA requires that the facts constituting the alleged violation and the facts demonstrating scienter—the defendant's intention to "deceive, manipulate, or defraud"—be pled with particularity.  Id. at 303 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n.14 (1976)).

The PSLRA functions to heighten the pleading standard required to survive a motion to dismiss in two ways.  First, "the complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  In re Hutchinson Tech., Inc. Sec. Litig.,

---

[2] Defendants primarily challenge the Plaintiffs' Section 10(b) and Rule 10b-5 claims as insufficiently pled allegations of misrepresentations and scienter, not causation and economic harm.  See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005) (noting that neither the pleading rules nor the security statutes impose special requirements to pleading proximate causation or economic loss).  For that reason, discussion on the elements of causation and economic harm is limited here.

536 F.3d 952, 958 (8th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(1)).  Next, "the complaint must,

'with respect to each act or omission alleged to violate this chapter, state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind.'"  Id.

(quoting 15 U.S.C. § 78u-4(b)(2)).  The required state of mind is scienter.  In re AMDOCS Ltd.

Sec. Litig., 390 F.3d 542, 547 n.3 (8th Cir. 2004).[3]

### b.  False Statements or Omissions of Material Facts

The first element under Section 10(b) and Rule 10b-5 is that the defendant made an

"untrue statement of a material fact" or "omit[ted] to state a material fact necessary in order to

make the statements made, in the light of the circumstances under which they were made, not

misleading."  17 C.F.R. § 240.10b-5(b).  To successfully assert a Section 10(b) claim, the

complaint must set forward with particularity the "'who, what, when, where and how' of the

misleading statements or omissions."  In re 2007 Novastar Fin., Inc. Sec. Litig., 579 F.3d 878,

882 (8th Cir. 2009) (quoting In re K-tel, 300 F.3d at 890).  An alleged omission is material

where there is "'a substantial likelihood that the disclosure of the omitted fact would have been

viewed by the reasonable investor as having significantly altered the 'total mix' of information

made available.'"  Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1318 (2011) (quoting

Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  Materiality is normally a "question of fact

for the jury."  Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 829 (8th Cir. 2003).  "The issue

is appropriately decided as a matter of law, however, when reasonable minds could not differ.  In

other words, if no reasonable investor could conclude public statements, taken together and in

---

[3] "Prior to the enactment of the PSLRA, pleadings were evaluated under Federal Rule of Civil Procedure 9(b) for particularity."  In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002).  The PSLRA supercedes and embodies the standards of Rule 9(b).  Id.

context, were misleading, then the issue is appropriately resolved as a matter of law." Silver v. H & R Block Inc., 105 F.3d 394, 396 (8th Cir. 1997).

Plaintiffs assert four theories in support of their arguments for Defendants' liability under Section 10(b) and Rule 10b-5. Each will be addressed in turn.

### i. Trends or Uncertainties

Plaintiffs first argue that Tile Shop violated Item 303 of Regulation S-K, 17 C.F.R. § 229.303, by failing to disclose trends or uncertainties that would have a material impact on Tile Shop net sales, revenues, or incomes. Specifically, Plaintiffs argue that Item 303 of Regulation S-K obligated Tile Shop to disclose its dependence on, and sourcing transactions with BP and the other two companies controlled by Nishi.[4] Defendants respond by arguing that the related-party transactions could not constitute trends or uncertainties altering Tile Shop's future performance because the alleged transactions were a long-time practice of Tile Shop.

In their reply brief, Tile Shop correctly notes that a recent Ninth Circuit decision casts doubt on whether an Item 303 disclosure can be actionable under Section 10(b) and Rule 10b-5. In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046 (9th Cir. 2014). The Ninth Circuit formed its conclusion by relying on a Third Circuit opinion by then-Judge Alito, Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000). Even more recently, however, the Second Circuit held that Item 303 disclosure can be actionable under Section 10(b) if certain conditions are met. Stratte-McClure v. Morgan Stanley, No 13-0627, 2015 WL 136312, at *6-8 (2d. Cir. Jan. 12, 2015). The Second

---

[4] Plaintiffs assert Item 303 of Regulation S-K claims under both the 1933 Act and 1934 Act. Because claims arising under the 1934 Act require more robust allegations, if a violation of Item 303 arising under the 1934 Act is found, then a Item 303 claim that also arises under the 1933 Act will be viable. See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359-60 (2d Cir. 2010) (comparing 1933 Act and 1934 Act claims).

Circuit, contrary to the Ninth, understood <u>Oran</u> to suggest that Item 303 violations could give rise to a material Rule 10b-5 omission and concluded that, "At a minimum, <u>Oran</u> is consistent with our decision that failure to comply with Item 303 in a Form 10-Q can give rise to liability under Rule 10b-5 so long as the omission is material under <u>Basic</u>, and the other elements of Rule 10b-5 have been established." <u>Id.</u> at *7.

The Second Circuit's reasoning is persuasive and consistent with this Court's reading of <u>Oran</u>. The analytical framework outlined in <u>Stratte-McClure</u> for Item 303 allegations does not conflict with the holding of <u>Oran</u> and will be applied accordingly.

A duty to disclose exists when either "a regulation, statute, or rule requires disclosure," or when further "disclosure is required to prevent a voluntary statement from being misleading." <u>In re MoneyGram Int'l, Inc. Sec. Litig.</u>, 626 F.Supp. 2d 947, 973 (D. Minn. 2009). Item 303 of Regulation S-K requires public companies to disclose "trends or uncertainties . . . that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii). A disclosure duty exists under Item 303 when a trend or event is both (1) "presently known to management," and (2) "reasonably likely to have material effects on the registrant's financial condition or results of operation." <u>Ir re Gander Mountain Co. Sec. Litig.</u>, No. 05-183, 2006 WL 140670, at *15 (D. Minn. Jan. 17, 2006) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835 ("Exchange Act Release"), 43 S.E.C. Docket 1330, 1989 WL 1092885 (May 18, 1989)).

The test for a duty to report under Item 303 involves a different inquiry than the "materiality" determination required under Section 10(b) and Rule 10b-5. Specifically, once a

trend becomes known, management must make two assessments:

> (1) Is the trend . . . likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend . . . on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

Exchange Act Release at *6; see also Oran, 226 F.3d at 288 (noting that Item 303's disclosure obligations "extend considerably beyond those required by Rule 10b-5").  If a duty to disclose is established, then the inquiry turns to whether the omission was material.

Tile Shop was required to disclose the trend of its increasing reliance on BP.  From fiscal year 2011 to fiscal year 2013, the percentage of Tile Shop product that passed through BP increased from 8.3 percent to 32.2 percent.  CAC ¶ 159.  This growth demonstrates a trend of increasing reliance on BP for Tile Shop product.  Given Tile Shop's comments in press releases and required corporate disclosures about its close relationships with its suppliers, Tile Shop management knew, or had access to information, about BP's growing importance.  The materiality of the trend is confirmed by Tile Shop's own repeated representations about how its supplier relationships are vital to its success.  The trend of consolidating the percentage of product sold to a single entity could have a material effect on Tile Shop's financial condition if that relationship was somehow compromised.  Given the significant reliance on BP for the product Tile Shop sold, a disruption in this relationship would be reasonably likely to impact Tile Shop's future performance.[5]

---

[5] Tile Shop argues that this trend is not material because Tile Shop's margins did not drop after Nishi ceased doing business with BP.  This information does not aid the analysis because the relevant inquiry is from a reasonable investor at the time of the misrepresentation.  Gebhardt 335 F.3d at 831.

## ii. Strength of Tile Shop's Supplier Relationships

Plaintiffs next argue that Tile Shop's statements attributing its successes to its sourcing model and the strength of its supplier relationships were misleading because Nishi's involvement with Tile Shop suppliers was not disclosed.[6]  Tile Shop and the Officer Defendants argue that the statements Plaintiffs identify are not misleading or otherwise actionable because they are immaterial puffery on which no reasonable investor would rely.

Puffery, or statements that are "so vague and such obvious hyperbole that no reasonable investor would rely upon them," are not actionable.  Parnes v. Gateway 2000, 122 F.3d 539, 547 (8th Cir. 1997).  The Second Circuit has held that statements that a company would not "compromise its financial integrity" or "business strategies would lead to continued prosperity" were inactionable puffery.  Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (per curiam).

Tile Shop has repeatedly attributed a significant amount of its success to its sourcing model and the strength of its supplier relationships.  The CAC is replete with such statements. E.g., CAC ¶¶ 110, 111, 112, 124, 128, 133, 135, 137, 143, 147, 153, 156.  These statements, while not independently actionable, can be considered in context, and as part of Defendants' more overarching statements.  See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 672 (6th Cir. 2005) ("The context of statements is often telling.").   These statements are not immaterial puffery.  More than assigning partial responsibility for its positive performance to the strength of its supplier relationships, Rucker, in a February 20, 2013

---

[6] Plaintiffs also claim that Tile Shop's relationship with the Zhangs somehow bolsters their Section 10(b) claims.  The Zhangs, while related to Rucker, are not an affinity that requires disclosure under 17 C.F.R. §229.404 and Rule 4-08(k)(1) of Regulation S-X.  Therefore, this relationship is not relevant to this discussion.

conference call, stated that Tile Shop's "direct sourcing model remain[ed] a material competitive advantage over the other players in the tile industry. . . ."  CAC ¶ 135.  Qualifying an advantage as "material" clearly stresses its importance.  This is not an expression of corporate optimism or opinion, but rather a factual statement directly attributing Tile Shop's financial success to the strength of its supplier relationships.  Thus, Tile Shop was obligated to disclose Nishi's involvement.  See, e.g., In re Providian Financial Corp. Sec. Litig., 152 F.Supp.2d 814, 824 (E.D. Penn. 2001) (noting that, because Providian attributed its "good fortunes to its 'customer focused approach'" it was "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.").[7]

Additionally, the statements or omissions must be material as well as misleading.  As noted before, the question of materiality is normally a question of fact.  Gebhardt, 335 F.3d at 829.  As alleged, Plaintiffs have identified facts that would have significantly altered the total mix of available information to the reasonable investor.

### iii.  Tile Shop's Lack of Control Over its Suppliers

Next, Plaintiffs argue that Tile Shop's statements about its lack of control over its suppliers were misleading because they failed to account for Tile Shop's related-party transactions.  Tile Shop and the Officer Defendants maintain that Plaintiffs have failed to plead

---

[7] In its reply brief, Tile Shop argues that since the CAC alleges that BP was an export trading company, it cannot rely on BP to demonstrate that Tile Shop's statements about its suppliers and supply chain were false.  This argument is unconvincing.  As described by Tile Shop, a Chinese export trading company coordinates the purchasing process between the vendor and seller.  Tile Shop Defs'. Reply Mem. Support Mot. Dismiss [Docket No. 102] 2.  Tile Shop explains that an export trading company is a vital cog in Tile Shop's supply chain.  Therefore, there is a sufficient connection here to support the argument that statements about Tile Shop's suppliers or its supply chain were misleading because BP is an export trading company.

facts supporting that Tile Shop actually controls its suppliers.

In the "Risk Factors" section of the 2012 third quarter Form 10-Q, Tile Shop made the

following statement:

> We do not control the operations of our suppliers. Accordingly, we cannot guarantee that our suppliers will comply with applicable environmental and labor laws and regulations or operate in a legal, ethical, and responsible manner. Violation of environmental, labor or other laws by our suppliers or their failure to operate in a legal, ethical, or responsible manner, could reduce demand for our products if, as a result of such violation or failure, we attract negative publicity. Further, such conduct could expose us to legal risks as a result of the purchase of products from non-compliant suppliers.

CAC ¶ 129.

In Tile Shop's March 18, 2013 Form 10-K, the Company made the following

statements regarding its supplier relationships:

> We believe that our long-term producer relationships, together with our design, manufacturing and distribution capabilities, enable us to offer a broad assortment of high-quality products to our customers, who are primarily homeowners, at competitive prices.

> ***

> We are able to maintain every-day low prices by purchasing tile and accessories directly from producers and manufacturing our own setting and maintenance materials.

> ***

> We have long-standing relationships with producers of our tiles throughout the world and work with them to design products exclusively for us. We believe that these direct relationships differentiate us from our competitors, who generally purchase commodity products through distributors. We are often the largest or exclusive customer for many of our producers.

Id. ¶ 137.  The same "Risk Factor" statement from the 2012 third quarter Form 10-Q was also

included.  Id. ¶ 138.

These statements are not actionable because Plaintiffs have not alleged sufficient facts

demonstrating the statements were false.  Generally, the CAC alleges that Tile Shop—through

Nishi and others, including Rucker—controlled its suppliers.  The statements identified by

Plaintiffs, however, describe a lack of control over the *operations* of their suppliers.  This

distinction is important because control over the operations of a business necessitates a greater

amount of control than the allegations in the CAC.  The CAC does not allege Tile Shop

controlled the business operations of any of its suppliers, including BP.  Without alleging such

facts, these claims premised on Tile Shop's statements regarding the control of its suppliers fail.

### iv.  Gross Margins

Finally, Plaintiffs argue that Tile Shop's statements directly linking its high gross

margins to its ability to supply product through its direct sourcing model misled investors

because Tile Shop failed to disclose that the reasons for its stated successes were largely the

result of Nishi's undisclosed involvement.  Tile Shop and the Officer Defendants argue that the

statements regarding Tile Shop's gross margins are not actionable because they are not alleged to

be misstated or false.

A party who makes voluntary disclosures regarding material facts assumes a duty to

speak fully and truthfully on those subjects.  Kushner v. Beverly Enterprises, Inc., 317 F.3d 820,

831 (8th Cir. 2003) (citing Helwig v. Vancor, Inc., 251 F.3d 540, 561 (6th Cir. 2001) (en banc),

cert. dismissed, 536 U.S. 935 (2002)).

Tile Shop made voluntary disclosures about the relationship between its direct sourcing

capabilities and its profit margins.  For example, in a November 1, 2012 press release, Rucker

stated, "Our model of direct sourcing, exceptional customer service, strategically located stores

and a proven distribution center model allows us to operate at high margins within this growing

industry."  CAC ¶ 124.  On its Form 10-Q that was filed on November 9, 2012, under the

heading "Gross Profit," Tile Shop stated that:

> [i]n 2011, 2010, and 2009 our gross margin was 73.6%, 73.3%, and 72.7%, respectively, . . . [f]or the nine months ended September 30, 2012 and 2011 our gross margin was 72.9% and 73.7%, respectively, . . . [w]e have been able to maintain stable gross margins as a result of product cost control and expect that our gross margin will continue in the same range.

Id. ¶ 127.

Additionally, in a February 20, 2013 press release, Rucker commented on Tile Shop's financial successes for the 2012 fourth quarter, stating "Our unique operating model, which combines direct sourcing, exciting in-store displays, exceptional customer service and strategically located stores, has enabled the Company to grow while maintaining our strong financial performance." Id. ¶ 133. After issuing the press release, Rucker, Clayton, and Watts held a conference call with investors. Id. ¶ 135. In this call, Watts stated that Tile Shop's "operating model produces extraordinary margins; in fact, they're elite in hard good retailing," and that "the strong revenue trends we saw in the fourth quarter are continuing early in the current year." Id.

Further, in its March 18, 2013 Form 10-K under the heading "Gross Profit," after noting its gross margins in 2010, 2011, and 2012, the Company stated:

> We have been able to maintain relatively stable gross margins as a result of product cost control and retail price adjustments, in the past. However, increases in freight and distribution costs, along with increased promotional activity may adversely impact our gross margins by 100 to 200 basis points over the next several years.

Id. ¶ 141.

Finally, in a May 1, 2013 press release announcing the financial results for the first quarter ending March 31, 2013, Rucker stated:

> This level of sales growth clearly demonstrate [sic] that our store layout and broad product assortment is providing a much needed solution to the needs of our customers. This unique 'in-store experience' is made possible by our operating model, which enables us to source distinctive products directly from quarries throughout the world. Our customer-focused store presentation, together with our direct sourcing capabilities, allows us to operate at high margins and drive value for all our stakeholders.

Id. ¶ 143.[8]

All of these statements were made without any mention that an undisclosed related person was involved in a significant volume of Tile Shop's total product sold.  In making such statements, Tile Shop was obligated to speak fully and truthfully.  Although the statements may have been literally true, the literal truth fails to appraise reasonable investors of the full story.  See Freedman v. St. Jude Medical, No. 12-3070, 2014 WL 910326, at *18 ("Even if the statement was literally true . . . that does not preclude it from being actionable under the securities laws.").  By disclosing that its gross margins can be attributed, at least partly, to its "model of direct sourcing" and its "long-term producer relationships," Tile Shop was obligated to fully inform investors of the nature of these relationships.  Because Tile Shop failed to do so, Plaintiffs have adequately alleged that Tile Shop's statements linking its high gross margins to its direct sourcing model were misleading.  Also, as before, the materiality of these statements are sufficiently pled.

### c.  Scienter

Tile Shop and the Officer Defendants also move to dismiss the Plaintiffs 1934 Act claims by arguing that they have failed to establish the requisite degree of scienter.  The Plaintiffs

---

[8] Additional statements taken from SEC filings, press releases, and conference calls are set forward in the CAC.  Not every allegedly misleading and false statement pertaining to Tile Shop's gross margins has been repeated here.

respond by arguing that the alleged facts, taken collectively, more than plausibly meet the scienter requirement.

Scienter means the intent to deceive, manipulate, or defraud. In re NationsMart Corp. Sec. Litig., 130 F.3d 309, 320 (8th Cir. 1997). To satisfy the scienter requirement, the CAC must "set forth facts that give a *strong* reason to believe that there was reckless or intentional wrongdoing." In re Navarre, 299 F.3d at 745 (emphasis in original). This can be established in three ways: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." Cornelia I. Crowell GST Trust, v. Possis Medical, Inc., 519 F.3d 778, 782 (8th Cir. 2008). Conduct that rises to the level of recklessness is limited to "'highly unreasonable omissions or misrepresentations' involving 'an extreme departure from the standards of ordinary care, and . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" In re K-tel, 300 F.3d at 893 (alteration and ellipsis in original) (quoting K & S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 978 (8th Cir. 1991)). "One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." In re Navarre, 299 F.3d at 746 (citing Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001)).

The determination of scienter is made by considering the totality of the allegations. In re Nash Finch Co. Sec. Litig., 502 F. Supp. 2d 861, 882 (D. Minn. 2007). A strong inference of scienter may arise by sufficiently alleging that the defendants "(1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew

21

facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor."  Kushner, 317 at 827 (citing Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)).

### i. Rucker

Given the totality of the allegations and viewing the facts collectively, Plaintiffs adequately allege scienter for Rucker.  At this procedural stage, the alleged facts demonstrate that Rucker "knew facts or had access to information" that Nishi was highly involved with companies whose business relationship was very significant to the success of Tile Shop.  See Tellabs, 551 U.S. at 314 (noting that the inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

First, Rucker has, on multiple occasions, recognized the importance of establishing and fostering relationships with Tile Shop suppliers.  Rucker has traveled worldwide to discover and cultivate these relationships, noting "if we didn't do this, we would get our lunch eaten.  That is the nature of the business."  CAC ¶ 176.  Further, not only did Rucker state that Tile Shop's "direct sourcing model remain[ed] a material competitive advantage over the other players in the tile industry" and that the Company "controls the entire process,"  Rucker asserted he was "personally involved."  Id. ¶¶ 135, 176.  He emphasized he has "gone out and found proprietary product," taking trips to Turkey, Spain, China, Vietnam and elsewhere.  Id. ¶¶ 135, 176.  Given these allegations, there is evidence that Rucker was an active participant in Tile Shop's sourcing business and had personal knowledge of Tile Shop suppliers in China.

Moreover, the alleged facts show that Rucker's relationship with Nishi was more meaningful than just a label of affinity.  Nishi worked with Rucker at Tile Shop for a number of years, where Nishi ultimately held the position of purchasing supervisor.  Id. ¶ 119.  Rucker and

Nishi also traveled overseas together to scout for new Tile Shop suppliers.  Id. ¶¶ 41, 72, 169.  A former employee stated there was no doubt that Rucker would know exactly what Nishi was doing in his role in BP.  Id. ¶ 44.  Another former employee claims that Rucker and Nishi's relationship was common office knowledge, and further alleges that Tile Shop employees, including a purchasing analyst, confirmed that Rucker was buying tile on the Company's behalf from Nishi.[9]  Id. ¶ 45.

Cumulatively, there are several lines of evidentiary support that could establish Rucker knew Tile Shop product line was dependent upon a company that was owned and controlled by his brother-in-law, who was also a Tile Shop purchasing supervisor.  At this stage, Plaintiffs have pled sufficient facts that give rise to a strong inference of scienter.

### ii. Clayton

Plaintiffs argue that the Sarbanes-Oxley Act ("SOX") Certifications that Clayton signed give rise to a strong inference of scienter.  Tile Shop and the Officer Defendants argue that without more, a SOX certification that is later proven false is an insufficient pleading of scienter.

Signed SOX certifications that are later proven false, standing alone, are insufficient to plead scienter.  In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 248 (8th Cir. 2008).  "Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time

---

[9] Defendants argue that the information from former employees is irrelevant here.  While Defendants are correct that none of the former employees worked for Tile Shop during the Class Period, it is proper to consider statements from former employees to establish the foundation that Rucker was personally involved in the sourcing and purchasing side of the Company's business.  This is corroborated by Tile Shop's own representations that Rucker was personally involved in sourcing.  See  In re Metawave Commc'ns Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("The Court can look to 'the level of the detail provided by the confidential witnesses, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'") (citing In re Cabletron Sys., Inc., 311 F.3d 11, 29-30 (1st Cir. 2002)).

they made their statements of compliance, [. . .] a showing in hindsight that the statements were false does not demonstrate fraudulent intent. Kushner. 317 F.3d at 827. If the opposite was true, that a mandatory SOX certification that was later proven to be inaccurate was sufficient to plead a strong inference of scienter, "scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." In re Ceridian, 542 F.3d at 248, (quoting Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007)).

The thrust of Plaintiffs' claim is that Clayton, as the Company's CFO during the Class Period, had knowledge that Tile Shop's internal controls were weak and in disarray. The CAC does allege some facts supporting that Tile Shop had deficient internal controls, such as the turnover of its outside auditors and that the Company did not have a CFO at the start of the Class Period. CAC ¶¶ 97, 98. But the CAC also identifies the steps Clayton took to rectify the situation, explaining that Clayton had "'initiated an analysis of [its] internal accounting controls and procedures' and had taken steps to improve the Company's operations, 'by designing and implementing a formalized financial reporting process . . . .'" Id. ¶ 96. Importantly, the part of the SOX certification that was later proven false was the failure to identify the related party transactions involving BP, not an accounting error or misstatement. Accordingly, Plaintiffs have failed to allege specific facts to sufficiently plead scienter against Clayton.

### iii.  Tile Shop

Scienter of a corporate officer may be imputed to the corporation itself. In re St. Jude Med., Inc. Sec. Litig., 836 F. Supp. 2d 878, 896 (D. Minn. 2011); see also In re St. Paul Travelers Sec. Litig., No. 04-4697, 2006 WL 2735221, *4 n.3 (D. Minn. Sep. 25, 2006) ("The

scienter of senior executives can be imputed to the corporate defendants.").  Because the

pleading of scienter against Rucker, Tile Shop's CEO, has been established, scienter is imputed

to Tile Shop, the corporate entity.

**2. Section 20(a)**

Plaintiffs also allege that the Officer Defendants, the Director Defendants, JWTS, and

TSI are "controlling persons" under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t.  The

Director  Defendants and JWTS move to dismiss the Section 20(a) claims, arguing that the CAC

does not sufficiently demonstrate they had actual control of the operations of the Company.[10]

Plaintiffs respond by arguing that their status as directors, coupled with their significant and

lucrative stock holdings, is sufficient to plead the requisite level control of at this stage.

Section 20(a) provides for liability for persons and entities who "directly or indirectly"

control a primary violator of the federal securities laws.  15 U.S.C. § 78t(a).  Control, undefined

in the statute, "has been interpreted as requiring only some indirect means of discipline or

influence short of actual direction to hold a 'controlling person' liable."  Lustgraff v. Behrens,

619 F.3d 867 (8th Cir. 2010) (quoting Farley v. Henson, 11 F.3d 827, 836 (8th Cir. 1993)).  To

state such a claim, Plaintiffs must prove:

> (1) that a 'primary violator' violated the federal securities laws; (2) that 'the
> alleged control person actually exercised control over the general operations of
> the primary violator'; and (3) that 'the alleged control person possessed—but did
> not necessarily exercise—the power to determine the specific acts or omissions

---

[10] Rucker, Clayton, and TSI move to dismiss the Section 20(a) claim against them.  They argue that dismissal is appropriate because Plaintiffs have not properly pleaded claims under Sections 11 and 12(a)(2) of the 1933 Act or under Section 10(b) of the 1934 Act.  Because Plaintiffs have sufficiently alleged Sections 11 and 12(a)(2) and 10(b) claims, the Section 20(a) claims against these Defendants remain.  See Parnes, 122 F.3d at 550 n.12 (noting that Section 15 and Section 20(a) claims were not viable because no actionable claim for violation of Section 11, Section 12(2), Section 10(b), or Rule 10b-5 survived).

upon which the underlying violation is predicated.'

Lustgraaf, 619 F.3d at 873 (quoting Farley, 11 F.3d at 835).  The second and third prongs are scrutinized according to ordinary notice-pleading standards.  Lestgraaf, 619 F.3d at 875.

The first prong has been established both by the Defendants own concessions and through allegations set forward in the CAC.  Plaintiffs correctly argue that they do not need to show that each controlling person exercised actual control over the transaction giving rise to the violation.  Martin v. Shearson Lehman Hutton, Inc., 986 F.2d 242, 244 (8th Cir. 1993).  However, facts alleging the control person actually exercised control over the primary violator's general operations are required.  Lestgraaf, 619 F.3d at 878 (citing Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985)).

The CAC fails to plead facts that sufficiently show Jacullo and JWTS actually exercised control over Tile Shop's general operations.  Similarly, their titles as directors of Tile Shop alone fail to prove that Kamin, Krasnow, Suttin, and Watts actually exercised control over Tile Shop.[11]  Plaintiffs also cite to the status of the defendants as significant beneficial owners of Tile Shop stock and their signatures on the registration statements used to conduct the Offerings.  This evidence, however, relies on speculation and does not satisfy the requirement that the facts must sufficiently allege that each named defendant actually exercised control.  Such facts are absent from the CAC.  Without more, their titles as directors and signatures on registration statements

---

[11] The CAC includes a quotation from Watts that was a part of an August 22, 2012 press release and references an opening statement Watts made during a February 20, 2013 conference call.  CAC ¶¶ 123, 135.  The substance of these broad statements about Tile Shop do not change the conclusion that evidence of actual control is insufficiently alleged.  The CAC also alleges that Suttin and Watts co-founded and controlled JWC, a blank check company, that was acquired by The Tile Shop LLC in June 2012.  CAC ¶ 84.  Suttin and Watts both received Tile Shop common stock shares as compensation.  Id. ¶ 86.  These transactions give rise to additional speculation; they do not establish actual control.

used to conduct the Offerings do not establish that Kamin, Krasnow, Suttin, and Watts actually exercised control over Tile Shop.  Thus, Section 20(a) claims against Jacullo, Kamin, Krasnow, Suttin, Watts, and JWTS fail and are dismissed.

## C.  The 1933 Act

Plaintiffs also assert claims under Sections 11, 12(a)(2), and 15 of the 1933 Act against various groups of defendants.  15 U.S.C. § 77k(a); 15 U.S.C. § 77*l*(2); 15 U.S.C. § 77*o*. "Sections 11 and 12(a)(2) impose liability on certain participants in a registered securities offering when the registration statement or prospectus associated with that offering contains material misstatements or omissions."  NECA-IBEW Health & Welfare v. Goldman Sachs & Co., 693 F.3d 145, 156 (2d Cir. 2012) cert denied, 133 S.Ct. 1624 (2013) (citing 15 U.S.C. §§ 77k, *l*(a)(2)).  Liability under Section 11 is imposed if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . ."  15 U.S.C. § 77k(a).  A Section 11 claim is available to "any person acquiring such security."  Id.  Section 12(a)(2) imposes liability under similar circumstances against "statutory sellers" for misstatements or omissions in a prospectus.  Id. § 77*l*(a)(2).  Finally, Section 15 imposes liability on individuals or entities that "control[] any person liable" under Sections 11 or 12.  15 U.S.C. § 77*o*.

Scienter, reliance, and loss causation are not required elements for Sections 11 or 12 claims and, because Plaintiffs' claims are not premised on allegations of fraud, the pleadings are not subject to the more stringent requirements Federal Rule of Civil Procedure 9(b) or the PSLRA.  Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012); 15 U.S.C. § 78u-4(b)(1)-(2).

### 1. Section 11

Plaintiffs allege Tile Shop, the Officer Defendants, the Director Defendants, and the Underwriter Defendants violated Section 11 of the 1933 Act by their misrepresentations and omissions in the registration statements of the Offerings.  Defendants acknowledge that the registration statement for the December 2012 Offering failed to include related-party transactions that Tile Shop was obligated to disclose.  As to the June 2013 Offering, the relevant Defendants argue that the Plaintiffs lack standing.  Specifically, Defendants argue that Plaintiffs did not purchase directly in the June 2013 Offering and the conclusory averment that Plaintiffs purchased shares traceable to the June 2013 Offering is insufficient.

"Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters" for deficiencies in registration statements.  NECA-IBEW, 693 F.3d at 157.  A plaintiff need only show that the security was purchased and that there was a material misstatement or omission.  NationsMart, 130 F.3d at 315.  Aftermarket purchasers can plead Section 11 claims if they can "trace his or her security to the allegedly defective registration statement at issue. . . ."  Lee v. Ernst & Young, LLP, 294 F.3d 969, 977 (8th Cir. 2002).

### a. The December 2012 Offering

Plaintiffs assert, and Defendants concede, that Plaintiffs Beaver County and Erie County purchased shares in the December 2012 Offering.  See Underwriter Defs'. Mem Supp. Partial Mot. to Dismiss CAC [Docket No. 92] 4.  It is also conceded that Tile Shop was required to and did not disclose its transactions with BP and Nanyang pursuant to related-party disclosure requirements set forward by Item 404(a) of Regulation S-K, 17 C.F.R. §229.404.  Tile Shop Defs'. Mem. Supp. Mot. to Dismiss [Docket No. 83] 7-8.  Therefore, Plaintiffs have standing to assert Section 11 claims arising from the December 2012 Offering.

### b. The June 2013 Offering

Plaintiffs also assert claims arising from the June 2013 Offering.  According to the Certifications submitted in connection with their application for appointment as Lead Plaintiffs, none of the Plaintiffs purchased shares directly in the June 2013 Offering.  Schwartz Decl. [Docket No. 93] Ex. 3.  Beaver County and Erie County did, however, purchase Tile Shop shares on multiple occasions after the date of the June 2013 Offering.  Defendants therefore argue that since no Plaintiffs purchased shares in the June 2013 Offering, they are required to "trace" their aftermarket purchases to the defective June 2013 Offering's registration statement.

Plaintiffs who purchased shares in the aftermarket have standing to sue if they can trace their shares back to the relevant offering.  Ernst & Young, LLP, 294 F.3d at 978.  Tracing is generally not an obstacle when all of a company's shares have been issued in a single offering under one registration statement.  Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1080 (9th Cir. 1999).  Here, Tile Shop shares began trading on the open market on August 22, 2012.  Tile Shop issued shares in the December 2012 and June 2013 secondary public offerings under registration statements that, according to Plaintiffs, both failed to account for related-party transactions that Tile Shop was obligated to disclose.  Since no Plaintiffs purchased shares in the June 2013 Offering and not all of Tile Shop's shares were issued in the Offerings, Plaintiffs must trace their shares back to the June 2013 Offering.

Plaintiffs do not dispute the difficulty of the tracing requirement.  It has been long noted that, given how securities markets operate, tracing shares back is "often impossible." Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967).  Nevertheless, Plaintiffs assert that simply pleading that the shares were purchased "pursuant and/or traceable to" the misleading registration statement is enough to survive a motion to dismiss.  Plaintiffs cite to a 2006 Third Circuit

decision as authority for their contention.  See In re Suprema Specialties, Inc. Sec. Litig., 438

F.3d 256, 274 n.7 (3d Cir. 2006) ("We agree with this view and hold that plaintiffs' assertions of

purchases 'in' and 'traceable to' the Suprema stock offerings were sufficient at the pleading

stage.").  However it is significant that the Suprema case, and others cited by Plaintiffs for the

same proposition, were decided before Twombly and Iqbal, which heightened general pleading

standards.  Pursuant to Twombly and Iqbal, the Plaintiffs are required to plead more than legal

conclusions supporting their "traceability" claim.

        This view is supported by other Circuits.  The Ninth Circuit recently held that a

conclusory pleading that alleged shares were purchased "traceable to" an defective registration

statement when shares were also trading in the aftermarket was insufficient.  In re Century

Aluminum Co. Sec. Litig., 729 F.3d 1104 (9th Cir. 2013).  The Ninth Circuit acknowledged that,

prior to Twombly and Iqbal, the mere allegation that stock was purchased "directly traceable to

the Company's Secondary Offering" was probably sufficient.  Id. at 1107.  The Fourth Circuit

agrees, holding that, without more, simply using the "'pursuant and/or traceable' to language" is

insufficient.  Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 900 (4th Cir. 2014).

        The cases cited by Plaintiffs in support of their position were decided before Twombly

and Iqbal.  Plaintiffs have alleged no facts and solely rely on broad boilerplate allegations that

are no longer sufficient to viably state this claim.[12]

        Plaintiffs additionally argue that because both the 2012 and 2013 registration statements

failed to include the related-party transactions and the claim directed to the June 2013 Offering

--------

[12] Some district courts have held that conclusory "traceable to" statements are sufficient
post Twombly and Iqbal.  See, e.g., In re Wachovia Equity Sec. Litig., 753 F.Supp.2d 326, 373
(S.D.N.Y. 2011).  These authorities rely on cases decided prior to Twombly and Iqbal and thus
are not pursuasive.

implicates the same wrongful conduct as the claim directed to the December 2012 Offering, the June 2013 claim should also survive.  Plaintiffs contend that, because they have sufficiently pled a Section 11 claim arising from the December 2012 Offering, they should be allowed to represent the interests of those who purchased in the June 2013 Offering because their claim implicates the same set of concerns that arise from the December 2012 Offering.

As support for this argument, Plaintiffs cite the Second Circuit decision of NECA-IBEW, 693 F.3d 145.  Put simply, the NECA-IBEW court held that a named plaintiff may have class standing to bring claims related to the residential mortgage-backed securities certificates that it had not purchased on behalf of the absent class members who purchased them.  Id. at 162.  The Second Circuit's decision, however, has been criticized as being inconsistent with established Supreme Court precedent and prior holdings at the Circuit level.  In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 934 F. Supp. 2d 1219 (C.D. Cal. 2013); see also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352-53 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press.").

In this case, facts show that none of the Plaintiffs purchased in the June 2013 Offering.  While mindful of the Second Circuit's non-precedential position on the matter, the Court declines to adopt its reasoning.  Holding that the Plaintiffs here do not have standing to assert claims on behalf of absent class members is consistent with this Circuit's established jurisprudence.  See, e.g., Miller v. Redwood Toxicology Labs. Inc., 688 F.3d 928, 933 (8th Cir. 2012) (noting that Article III standing requires the plaintiff to suffer an injury).

### 2. Section 12(a)(2) Claims

Plaintiffs also plead claims arising from Section 12(a)(2) of the 1933 Securities Act against all Defendants for material misrepresentations in connection with the offer and sale of

Tile Shop securities.  Defendants argue that Plaintiffs' claims arising from the December 2012

Offering must be dismissed because Plaintiffs have failed to allege recoverable damages.  As to

claims arising from the June 2013 Offering, Defendants argue those claims must be dismissed

because no Plaintiff took title to any Tile Shop shares directly from the Underwriter Defendants.

Section 12(a)(2) "creates a private remedy for the buyer of a security against the seller

for material misrepresentation in connection with the offer and the sale." NationsMart, 130 F. 3d

at 318 (citing 15 U.S.C. §77l).  A "Seller," under Section 12(a)(2), is anyone "who successfully

solicits the purchase, motivated at least in part by a desire to serve his own financial interests or

those of the securities owner." In re Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 635 (3d

Cir 1989) (quoting Pinter v. Dahl, 486 U.S. 622, 648 (1988)).  Section 12(a)(2) applies only to

sales of securities in public offerings and not to secondary market transactions.  See Gustafson v.

Alloyd Co., Inc., 513 U.S. 561, 578 (1995).

### a.  The December 2012 Offering

The remedies available for Section 12(a)(2) claims are limited to rescission or rescissory

damages if the shares have already been sold.  See 15 U.S.C. §77l(a)(2)(b) (purchasers are

entitled "to recover the consideration paid for such security with interest thereon, less the amount

of any income received thereon, upon the tender of such security, or for damages if he no longer

owns the security.").  Defendants argue that Plaintiffs have failed to allege recoverable damages

for their claims arising from the December 2012 Offering.  Defendants reason that because the

Plaintiffs purchased shares in the December 2012 Offering at $15 per share and Tile Shop shares

were trading in excess of $15 per share for at least 79 business days subsequent to the filing of

this lawsuit, Plaintiffs had ample time to avail themselves of the remedies provided by Section

12(a)(2).  Thus, Defendants argue, by retaining their Tile Shop shares when they were trading

above the $15 per share mark, Plaintiffs made an investment decision and should be not allowed to use this lawsuit, and rescission, to hedge against any potential loss.

Defendants cite to a line of cases granting or affirming dismissal of Section 12(a)(2) claims when the shares were trading above the plaintiffs' purchase price.  For example, in Merzin v. Provident Fin. Grp., Inc., plaintiffs pursued a Section 12(a)(2) claim for shares they purchased at $25.00 per share.  311 F.Supp.2d 674, 684 (8th Cir. 2004).  When the case was decided, the shares were trading in excess of $30.00 per share.  Id.  The Merzin court dismissed the Section 12(a)(2) claim because the remedy available, rescission, would result in a loss for the plaintiffs.  Id.  These cases, however, do not squarely address the situation faced here, nor do they stand for the proposition that Plaintiffs were required to sell their shares when they were trading above $15 per share.  Notably absent from these cases is any discussion or reference to a duty or obligation of the plaintiff to mitigate their damages by selling their shares for value that exceeded the purchase price if the opportunity arose.

When discussing damages under Section 11 and 12 of the 1933 Act, the court in Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc. noted that causation is irrelevant under Section 12 claims.  821 F.Supp. 212, 220 (S.D.N.Y. 1993).  The decision to not require causation was intentional, as "Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud."  Id. (quoting Randall v. Loftsgaarden, 478 U.S. 647, 659 (1986)).  Although Westinghouse does not explicitly address the exact question posed here, its comment about risk shifting supports the position that Defendants must bear the consequences of making misstatements in offering documents.  Indeed, "it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."  Janigan v. Taylor, 344 F.2d 781, 876 (1st

Cir. 1965).

Finally, a successful recovery by Plaintiffs is not guaranteed.  The Plaintiffs are not completely shielded from any additional diminution in value their Tile Shop shares may face.  If, for example, these claims are later found to be lacking, Plaintiffs will not be able to use rescission to recoup their initial $15 per share investment.

Respectful of the concerns raised by the Defendants, dismissal of the Plaintiffs' Section 12(a)(2) claims is inappropriate.  When this claim was asserted on the date the CAC was filed, Tile Shop shares closed below $15 per share and Plaintiff tendered their shares to the Defendants named here.  Accordingly, at this stage, Plaintiffs have satisfied the pleading requirements set forward in Section 12(a)(2).  Defendants have not provided any authority that requires Plaintiffs to dispose of their securities if the shares rise above the amount they were purchased for.  Therefore, Section 12(a)(2) claims arising from the December 2012 Offering remain viable.

### b.  The June 2013 Offering

Section 12(a)(2) liability is limited to public offerings.  Gustafson, 513 U.S. at 578.  Since none of the Plaintiffs purchased shares directly in the June 2013 SPO, Section 12(a)(2) claims arising from the June 2013 SPO are dismissed.

### 3.  Section 15 Claims

Count III of the CAC asserts control person liability claims under Section 15.  The test for liability under this Section is the same for liability under Section 20(a), described above.  Farley, 11 F.3d at 835.  The conclusion is also the same.  Section 15 claims against JWTS, Jacullo, Kamin, Krasnow, Suttin, and Watts are dismissed.[13]

---

[13] The Tile Shop Defendants move to dismiss the Section 15 claims against them on the same grounds as to the Section 20(a) claims above.  For the reasons given above, the Section 15

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Tile Shop Holdings, Inc., Robert A. Rucker, The Tile Shop, Inc.,

and Timothy C. Clayton's Motion to Dismiss [Docket No. 81]; Peter J. Jacullo III, Peter H.

Kamin, Todd Krasnow, Adam L. Suttin, and William E. Watts and JWTS, Inc.'s Motion to

Dismiss [Docket No. 86]; and Robert W. Baird & Co., Inc., Citigroup Global Markets Inc., CJS

Securities, Inc., Houlihan Lokey Capital, Inc., Piper Jaffray & Co., Sidoti & Company, LLC,

Telsey Advisory Group LLC, and Wedbush Securities, Inc.'s Motion to Dismiss [Docket 90] are

**GRANTED IN PART** and **DENIED IN PART** as follows:

1.  The Motions seeking to dismiss Plaintiffs' Section 11 of the 1933 Act claims arising from the June 2013 Offering against Tile Shop Holdings, Inc., Robert A. Rucker, Timothy C. Clayton, Peter J. Jacullo III, Peter H. Kamin, Todd Krasnow, Adam L. Suttin, William E. Watts, JWTS, Inc., Robert W. Baird & Co., Inc., Citigroup Global Markets Inc., CJS Securities, Inc., Houlihan Lokey Capital, Inc., Piper Jaffray & Co., Sidoti & Company, LLC, Telsey Advisory Group LLC, and Wedbush Securities, Inc., the Motions are GRANTED.

2.  The Motions seeking to dismiss Plaintiffs' Section 12(a)(2) of the 1933 Act claims:

    A.  Arising from the December 2012 Offering against  Tile Shop Holdings, Inc., Robert A. Rucker, Timothy C. Clayton, The Tile Shop, Inc., JWTS, Inc., Robert W. Baird & Co., Inc., Citigroup Global Markets Inc., CJS Securities, Inc., Houlihan Lokey Capital, Inc., Piper Jaffray & Co., Sidoti & Company, LLC, Telsey Advisory Group LLC, and Wedbush Securities, Inc., the Motions are DENIED.

    B.  Arising from the June 2013 Offering against  Tile Shop Holdings, Inc., Robert A. Rucker, Timothy C. Clayton, The Tile Shop, Inc., JWTS, Inc., Robert W. Baird & Co., Inc., Citigroup Global Markets Inc., CJS Securities, Inc., Houlihan Lokey Capital, Inc., Piper Jaffray & Co., Sidoti & Company, LLC, Telsey Advisory Group LLC, and Wedbush Securities, Inc., the Motions are GRANTED.

---

claims against the Tile Shop Defendants remain.

3.      The Motions seeking to dismiss Plaintiffs' Section 15 of the 1933 Act claims:

      A.      Against The Tile Shop, Inc., Robert A. Rucker, and Timothy C. Clayton, the Motions are DENIED.

      B.      Against Peter J. Jacullo III, Peter H. Kamin, Todd Krasnow, Adam L. Suttin, William E. Watts and JWTS, Inc., the Motions are GRANTED.

4.      The Motions seeking to dismiss Plaintiffs' Section 10(b) of the 1934 Act and Rule 10b-5 claims against Tile Shop Holdings, Inc and Robert A. Rucker, the Motions are DENIED.

5.      The Motion seeking to dismiss Plaintiffs' Section 10(b) of the 1934 Act and Rule 10b-5 claims against Timothy C. Clayton, the Motions is GRANTED.

6.      The Motions seeking to dismiss Plaintiffs' Section 20(a) of the 1934 Act claims:

      A.      Against The Tile Shop, Inc., Robert A. Rucker, and Timothy C. Clayton, the Motions are DENIED.

      B.      Against Peter J. Jacullo III, Peter H. Kamin, Todd Krasnow, Adam L. Suttin, William E. Watts and JWTS, Inc., the Motions are GRANTED.


BY THE COURT:


        s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 4, 2015.