# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Beaver County Employees' Retirement
Fund; Erie County Employees' Retirement
System; and Luc De Wulf, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiffs,

    v.

Tile Shop Holdings, Inc.; Robert A. Rucker;
The Tile Shop, Inc.; Timothy C. Clayton;
Peter J. Jacullo, III; JWTS, Inc.; Peter H.
Kamin; Todd Krasnow; Adam L. Suttin;
William E. Watts; Robert W. Baird & Co.
Incorporated; Citigroup Global Markets Inc.;
CJS Securities, Inc.; Houlihan Lokey Capital,
Inc.; Piper Jaffray & Co.; Sidoti & Company,
LLC; Telsey Advisory Group LLC; and
Wedbush Securities, Inc.,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-786 ADM/TNL

---

Matthew L. Mustokoff, Esq., Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Joseph F.
Russello, Esq., Robbins Geller Rudman & Dowd LLP, Melville, NY; and Jeffrey D. Bores, Esq.,
Chestnut Cambronne, PA, Minneapolis, MN, on behalf of Plaintiffs.

Wendy J. Wildung, Esq., Faegre Baker Daniels LLP, Minneapolis, MN; David P. Pearson, Esq.,
Winthrop & Weinstine, PA, Minneapolis, MN; Daniel J. Supalla, Esq., Briggs & Morgan, PA,
Minneapolis, MN; and Jed M. Schwartz, Esq., Milbank Tweed Hadley & McCloy LLP, New
York, NY, on behalf of Defendants.

---

## I.  INTRODUCTION

On June 3, 2016, the undersigned United States District Judge heard oral argument on

Plaintiffs Beaver County Employees' Retirement Fund ("Beaver County"), Erie County

Employees' Retirement System ("Erie County") (collectively, the "Counties"), and Luc De

Wulf's (collectively, "Plaintiffs") Motion to Certify Class, Appoint Class Representatives, and

Appoint Class Counsel [Docket No. 177].  Defendants Tile Shop Holdings, Inc. ("Tile Shop"),

Robert A. Rucker, The Tile Shop, Inc., Timothy C. Clayton; Peter J. Jacullo, III, Peter H. Kamin,

Todd Krasnow, Adam L. Suttin, William E. Watts, JWTS, Inc., Robert W. Baird & Co., Inc.,

Citigroup Global Markets Inc., CJS Securities, Inc., Houlihan Lokey Capital, Inc., Piper Jaffray

& Co., Sidoti & Company, LLC, Telsey Advisory Group LLC, and Wedbush Securities, Inc.

(collectively, "Defendants") oppose the motion.  For the reasons set forth below, Plaintiffs'

motion is granted.

## II.  BACKGROUND

This securities class action seeks relief under the Securities Act of 1933 and the

Securities Exchange Act of 1934.  Plaintiffs' claims are premised on Tile Shop's failure to

disclose related-party relationships and transactions.

### A.  Alleged Unlawful Activities

Tile Shop is a specialty retailer of manufactured and natural stone tiles, setting and

maintenance materials, and related accessories.  Consolidated Am. Compl. [Docket No. 66]

("CAC") ¶ 2.  As more fully explained in the March 4, 2015 Memorandum Opinion and Order

[Docket No. 108], Plaintiffs allege that Fumitake Nishi, the brother-in-law of Tile Shop founder

and then-CEO Robert A. Rucker, owned interests in overseas companies that transacted with

Tile Shop to source and import materials.  Id. ¶ 4.  Plaintiffs further allege that Nishi, who was a

purchasing supervisor for Tile Shop, purchased significant amounts of material for Tile Shop at

artificially low prices through the entities he owned.  Id. ¶¶ 4, 6, 64.  The relationship between

Nishi and the overseas companies with which Tile Shop transacted business were not reported in

any of Tile Shop's mandatory public disclosures.

On November 14, 2013, Gotham City Research published a report (the "Gotham Report") that exposed the undisclosed Nishi relationship and related transactions.  Id. ¶ 6.  The Gotham Report additionally stated that Tile Shop's margins and profits were artificially inflated as a result of Nishi's ability to obtain product at a favorable rate.  Id.  That same day, Tile Shop issued a press release announcing an investigation into its relationship with a company Nishi owned.  Id. ¶ 7.  The market reacted by Tile Shop's stock price dropping almost 39% on an unusually high volume of trading.  Id.

On January 28, 2014, Tile Shop filed with the SEC a Form 8-K and an attached press release dated the previous day.  Id. ¶ 164.  The release verified the relationship between Tile Shop, Nishi, and the overseas companies, and identified steps Tile Shop would take in response.  Id.  Tile Shop's stock price dropped by nearly 6.7% on a high volume of trading on that day.  Id. ¶ 167.

**B.  Procedural History**

Several Tile Shop shareholders filed putative securities class actions that were later consolidated and transferred to the District of Minnesota, and the CAC was filed on May 23, 2014.  The CAC asserts five causes of action, three of which arise under the Securities Act of 1933 and the remaining two under the Securities Exchange Act of 1934.  See id. ¶¶ 201–231.

On December 12, 2014, the Court heard argument on Defendants motions to dismiss [Docket Nos. 81, 86, 90].  On March 4, 2015, this Court granted in part and denied in part the motions to dismiss.  See Mem. Op. Order.  Plaintiffs' Section 11 and Section 12(a)(2) claims asserted under the Securities Act of 1933 arising from the December 2012 public offering of Tile Shop stock were allowed to proceed.

Section 11 claims resulting from the June 2013 public offering were dismissed as Plaintiffs lacked standing.  Additionally, because no named Plaintiff had actually purchased Tile Shop securities in the June 2013 offering, the Section 12(a)(2) claims premised on that offering were also dismissed.

As to the claims asserted under the Securities Exchange Act of 1934, Plaintiffs' Section 10(b) and Rule 10b-5 claims were allowed to proceed against Tile Shop and Rucker, and control person liability claims under Section 20(a) alleged against Tile Shop, Rucker, and Tile Shop CFO Timothy Clayton also remain in suit.

## C.  Proposed Class and Subclass

Plaintiffs now seek to certify a class of "all persons and entities who purchased or otherwise acquired Tile Shop common stock between August 22, 2012, and January 28, 2014" (the "Class").  Plaintiffs also seek to certify a subclass of "all persons and entities who purchased or otherwise acquired Tile Shop common stock pursuant and/or traceable to the prospectus and registration statement issued in connection with Tile Shop's public offering of common stock in December 2012" (the "Subclass").

## III.  DISCUSSION

## A.  Class Certification Standard

For class certification to be appropriate, a plaintiff must first establish the four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure.  Class certification is proper when (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative party are typical of the class (typicality); and (4) the representative party

will fairly and adequately protect the interests of the class (adequacy).  Fed. R. Civ. P.

23(a)(1)–(4).  Upon satisfying these four requirements, a party seeking class certification must

also demonstrate that the action falls within one of the three categories of Rule 23(b).  Fed. R.

Civ. P. 23(b); In re St. Jude Med., Inc., 425 F.3d 1116, 1119 (8th Cir. 2005).  Here, Plaintiffs

invoke Rule 23(b)(3), which permits a class action to be maintained if two requirements are met:

"Common questions must 'predominate over any questions affecting only individual members';

and class resolution must be 'superior to other available methods for the fair and efficient

adjudication of the controversy.'"  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997)

(quoting Fed. R. Civ. P. 23(b)(3)).

Plaintiffs bear the burden of proving both the threshold Rule 23(a) factors and the two

requirements of Rule 23(b)(3).  See Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994).  When

considering a motion for class certification, the court takes the substantive allegations in the

plaintiff's complaint as true, as the issue is resolved, not by an investigation into the merits of the

claim, but rather by consideration of the class certification criteria.  Thompson v. Am. Tobacco

Co., 189 F.R.D. 544, 549 (D. Minn. 1999); Lockwood Motors, Inc. v. Gen. Motors Corp., 162

F.R.D. 569, 573 (D. Minn. 1995).  Nonetheless, a motion for class certification "generally

involves considerations that are 'enmeshed in the factual and legal issues comprising the

plaintiff's cause of action.'"  Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978) (citation

omitted).  Only after a rigorous analysis of the proposed class and the requirements of Rule 23

may a court grant class certification.  See Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982);

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011).  A district court retains discretion

in the decision to certify a class.  Luiken v. Domino's Pizza, LLC, 705 F.3d 370, 372 (8th Cir.

2013).

**B. The Class**

Plaintiffs seek to certify a class of "all persons and entities who purchased or otherwise acquired Tile Shop common stock between August 22, 2012, and January 28, 2014." Defendants raise challenges to the typicality and predominance requirements. Nevertheless, because a rigorous analysis must precede class certification, each Rule 23(a) factor will be addressed.

**1. Federal Rule of Civil Procedure 23(a)**

**a. Numerosity**

Rule 23(a)(1) requires that the class must be so numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a)(1). Defendants have stipulated that the proposed Class is sufficiently numerous to satisfy Rule 23(a)(1). Mustokoff Decl. [Docket No. 180] Ex. 1. The Court agrees; given that 5.175 million shares of Tile Shop stock were sold in the December 2012 public offering, joinder of all potential members would be impracticable. Plaintiffs satisfy the numerosity requirement.

**b. Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Like numerosity, Defendants have stipulated to a finding of commonality for the proposed Class. Mustokoff Decl. Ex. 1. A careful review of the record does not reveal anything that would significantly individualize the claims. Commonality for the proposed Class is met.

**c. Typicality**

Defendants' primary challenge to class certification under Rule 23(a) is focused on the third requirement under Rule 23(a), that the claim or defense of the representative parties is

6

typical of the claims or defenses of the proposed class.  Fed. R. Civ. P. 23(a)(3).  This

requirement means that there are "other members of the class who have the same or similar

grievance as the plaintiff."  Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996).

Rule 23(a)(3) is "intended to assure the claims of the class representative are similar enough to

those of the class, so that the representatives will adequately represent the class."  In re Baycol

Prods. Litig., 218 F.R.D. 197, 205 (D. Minn. 2003).

Defendants present two arguments to defeat typicality.  First, Defendants argue that

Plaintiffs' substantial and unusual purchases of Tile Shop stock after the Gotham Report was

published exposes their claims to unique defenses of non-reliance that are atypical to the rest of

the proposed Class.[1]  Defendants also argue that the Counties' Tile Shop stock purchases were

made by a third-party institutional advisor who was informed, in-part, by non-public

information.  It is argued this circumstance raises unique theories of defense that render these

plaintiffs atypical.

### i. Post-Gotham Report Purchases

All three named Plaintiffs purchased significant amounts of Tile Shop stock after the

related-party transactions were made public by the November 14, 2013 Gotham Report.  De

Wulf more than doubled his Tile Shop stock holdings after November 14, 2013, and 31% of the

Counties' total purchases during the proposed class period were made after the Gotham Report

was published.  Krypel Aff. [Docket No. 234] Exs. C–E.  The timing of purchases, argues

Defendants, rebuts the Plaintiffs' reliance presumption because it demonstrates that Plaintiffs

---

[1] As more fully explained below, to succeed on their claims, Plaintiffs must show that
they relied on the misrepresentation or omission—Tile Shop's failure to disclose the Nishi
relationship and transactions—when purchasing their Tile Shop stock.

"would have bought or sold the stock even had [they] been aware that the stock's price was tainted by fraud." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2408 (2014) ("Halliburton II").

There is authority for Defendants' argument. Plaintiffs in George v. China Automotive Systems, Inc., for example, made multiple post-disclosure purchases and "engaged in significant 'in-and-out' trading activity during the Class Period." No. 11-7533, 2013 WL 3357170, at *3 (S.D.N.Y. July 3, 2013). Because both the multiple post-disclosure purchases and the "in-and-out" trading activity presented unique questions that would "require considerable time and resources and indeed threaten to become the focus of the litigation," the named plaintiffs were deemed atypical. Id. at *6–7.

There are also distinct factual scenarios where post-disclosure purchases will impair a proposed class representative's typicality. For instance, in Rocco v. Nam Tai Electronics, Inc., the proposed class representative made numerous post-class purchases armed with non-public knowledge of corporate fraud. 245 F.R.D. 131, 136 (S.D.N.Y. 2007). Similarly, In re DVI Inc. Securities Litigation recognized that purchasing a "disproportionately large percentage" of securities after a corrective disclosure may defeat utilization of the fraud-on-the-market presumption. 249 F.R.D. 196, 204 n.13 (E.D. Penn. 2008). On the other hand, there is countervailing authority that holds post-disclosure purchases do not destroy typicality. Recognizing that "[r]eliance on the integrity of the market prior to disclosure of alleged fraud . . . is unlikely to be defeated by post-disclosure reliance on the integrity of the market," the Fifth Circuit rejected the argument that post-disclosure purchases in a fraud-on-the-market securities suit categorically precluded a proposed class representative. Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 138 (5th Cir. 2005).

Feder and its underlying rationale is persuasive.  The fraud-on-the-market theory, which Plaintiffs invoke, presumes that in efficient markets all public information is incorporated into the security's price.  Plaintiffs' averments that they purchased shares during the proposed class period in reliance on the integrity of the market is not poisoned by their later post-Gotham Report purchases.  "This later purchase does not undercut or diminish the argument that the same investor may have purchased the security pre-disclosure relying on the fact that all information available at the time was reflected in the then current price." DVI Inc., 249 F.R.D. at 204; see also In re K-V Pharma. Co. Sec. Litig., No. 11-1816, 2012 WL 1570118, at *6 (E.D. Mo. May 3, 2012) ("Courts have consistently rejected the argument that post-disclosure purchases preclude a proposed class representative from meeting Rule 23(a) requirements in a fraud-on-the-market suit.").  The Court is unconvinced that named Plaintiffs' post-Gotham Report purchases will threaten to derail the case from proceeding for the remainder of the Class.[2]

Additionally, Plaintiffs here were not in possession of non-public knowledge at the time they made their post-disclosure purchases, and Plaintiffs' post-disclosure purchases are not so disproportionately large to render them atypical.  See In re Pfizer Inc. Sec. Litig., 282 F.R.D. 38, 46 n.5 (S.D.N.Y. 2012) (concluding that proposed class representative was typical despite

---

[2] Defendants also argue that Plaintiffs' testimony regarding their post-Gotham Report purchases demonstrates that their Tile Shop stock acquisitions were not made in reliance on the integrity of the market, but were rather motivated by their belief that the stock was now priced correctly.  Defendants contend this testimony is fatally inconsistent with Plaintiffs' theory of the case, that classwide injury resulted from purchasing Tile Shop stock at artificially inflated prices. Again, the Court is not persuaded that this challenge presents a unique defense that threatens to undermine Plaintiffs reliance on the integrity of the market.  While Plaintiffs offer their unique justifications for their post-Gotham purchases, their testimony does not contradict their reliance on the market's integrity in making those purchases.  Significantly, the post-Gotham Report purchases were made before the alleged January 28, 2014 corrective disclosure—the press release and ostensibly connected 6.8% drop in stock price.

purchasing "1,641,600 shares [post-disclosure], representing approximately 44% of [plaintiff's] entire . . . purchases during the Proposed Class Period").

### ii. Non-Public Information

The Counties each traded in Tile Shop stock through their third-party investment advisor, Emerald Advisers, Inc. ("Emerald").  In this role, Emerald had full discretion to manage the assets of the Counties and, therefore, Emerald was the entity that elected to purchase Tile Shop stock.  Defendants assert that Emerald's trading decisions were motivated by a proprietary research process that includes direct communication with the companies it was researching.  Defendants also argue that Emerald had one-on-one contact with Tile Shop executives including Rucker and CFO Tim Clayton.  These circumstances, Defendants argue, impeach the Counties' position as class representatives because they are subject to unique theories of non-reliance.

Defendants cite a November 21, 2013 meeting between Rucker, Clayton, and Emerald portfolio manager, Stacy Sears, as evidence for its argument that the Counties are atypical institutional investors.  This meeting rather than market factors, Defendants' contend, motivated the Counties' November 21, 2013 stock purchases.  In response, the Counties argue that the November 21, 2013 meeting was merely one of dozens of meetings Tile Shop executives held with institutional investors following publication of the Gotham Report.  The Counties portray these meetings as "damage control" and common practice between public companies and large-scale investors following negative press, which, the Counties argue, are designed to assuage investor concern and stem further stock price erosion.  The Counties also argue that no non-public information was disclosed to Sears in that meeting, and that Tile Shop was merely repeating the message it had conveyed in its prior meetings with other investment advisors.

The Counties' use of an investment advisor who purchased Tile Shop stock on their

behalf does not, without more, preclude serving as class representatives.  As noted by the

Eleventh Circuit, "a large institutional investor is likely to rely on investment advisors to make

investment decisions on its behalf.  And yet both Congress and the courts have recognized that

these sorts of investors are generally preferred as class representatives in securities litigation."

Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin., Corp., 762 F.3d

1248, 1260 (11th Cir. 2014) (citing 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I)).

Defendants cite authority holding that plaintiffs who are in possession of non-public

information are atypical due to unique theories of defense.  See, e.g., Beach v. Healthways, Inc.,

No. 08-569, 2009 WL 3245393, at *3 (M.D. Tenn. Oct. 5, 2009) ("The presumption of reliance

may be rebutted if a purchaser of stock relies on non-market information that is not generally

available to the public and, therefore, not available to the unnamed class members."); In re

Indep. Energy Holdings PLC Sec. Litig., 210 F.R.D. 476, 481 (S.D.N.Y. 2002) ("where plaintiffs

are privy to non-public information not available to other investors, they may be subject to

unique reliance defenses making them atypical and inadequate class representatives").  However,

the record lacks support for Defendants' contention that non-public investment information was

disclosed during Emerald's meeting and communications with Tile Shop executives.[3]  Emerald

was but one of nearly four dozen institutional advisors that met with Tile Shop executives

following publication of the Gotham Report.  And both Rucker and Emerald testified that no

non-public information was discussed during their meeting.  These are significant differences

from Beach, where the investment manager had unique and sole access to company officers, and

_____

[3] If Tile Shop executives did disclose non-public information to Sears, SEC's Fair
Disclosure Regulation's prohibition against disclosure of material information to select investors
ahead of the general public would likely have been implicated.  17 C.F.R. 243.100.

also acquired information and investigated matters that were non-public.  2009 WL 3245393, at

*5.  Put simply, the concerns that persuaded the <u>Beach</u> court to conclude that the institutional

investor plaintiff did not meet the typicality requirement are not present here.

The arguments raised by Defendants do not defeat Plaintiffs' typicality under Rule

23(a)(3).  Accordingly, certification for the proposed Class will not be denied for failure to

satisfy Rule 23(a)(3).

### d. Adequacy

Rule 23(a)(4) permits class certification if "the representative parties will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry

under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class

they seek to represent."  <u>Amchem</u>, 521 U.S. at 625.

Here, Defendants do not offer arguments—apart from the typicality challenges—that

seek to undermine Plaintiffs' ability to adequately represent the interests of the proposed class.

Because the typicality challenges have failed, there is no reason to believe that Plaintiffs will not

fairly and adequately protect the interests of the class.  Moreover, no perceived conflicts of

interest between Plaintiffs and the proposed Class have been identified, and Plaintiffs' counsel

are experienced in prosecuting securities class actions.  Plaintiffs therefore satisfy the adequacy

requirement of Rule 23(a)(4).

### 2. Predominance Under Federal Rule of Civil Procedure 23(b)(3)

Along with the requirements of Rule 23(a), Plaintiffs must also establish that one or more

of the grounds for maintaining the suit under Rule 23(b) are met.  Here, Plaintiffs seek

certification under Rule 23(b)(3), which provides that a class may be certified if "questions of

law or fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Defendants do not contest, and the Court agrees, that a class action is the superior method to adjudicating this controversy. Defendants do, however, challenge whether questions of law or fact common to class members predominate over questions affecting only individual members.

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Halliburton I"). The elements controlling this case for the proposed class are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1207 (2013) (citations omitted).

The reliance factor is largely determinative of whether common questions of fact predominate. Halliburton I 563 U.S. at 810. The Supreme Court has articulated two means for invoking a rebuttable presumption of reliance. Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 159 (2008). The first arises "if there is an omission of a material fact by one with a duty to disclose." Id.[4] The second, dubbed the "fraud-on-the-market" doctrine, results when "a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e. efficient) market." In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 481 (2d Cir. 2008) (citing Basic v. Levinson, 485 U.S. 224, 248 n.7 (1988)).

---

[4] This presumption was first recognized in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), hence the naming of the Affiliated Ute presumption.

Plaintiffs argue they are entitled to both presumptions of reliance.

### a. **Affiliated Ute** Presumption

The Affiliated Ute presumption applies to claims "involving primarily a failure to disclose" by one with a duty to disclose. Affiliated Ute, 406 U.S. at 153. Plaintiffs argue that the facts here present a classic "omission" case; Tile Shop had a duty to disclose the Nishi related-party relationship and transactions and it failed to do so. Defendants disagree and argue that this is a "scheme" rather than an "omission" case. Defendants additionally argue that because Tile Shop is a publicly traded company, the Affiliated Ute presumption cannot be the sole or principal basis for presuming reliance.

The Affiliated Ute presumption is "limited to cases that can be characterized as . . . primarily alleg[ing] omissions." Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 940 (9th Cir. 2009) (quotation marks omitted and alterations in original). The difference between an "omission," which earns a rebuttable presumption, and a "misrepresentation" or "manipulation," which does not, has been addressed at length. See, e.g., Goodman v. Genworth Fin. Wealth Mgmt., Inc., 300 F.R.D. 90, 104 (E.D.N.Y. 2014); Desai, 573 F.3d at 941. In Joseph v. Wiles, the Tenth Circuit distinguished between omissions and affirmative misrepresentations. 223 F.3d 1155, 1162 (10th Cir. 2000). In that case, the presumption was held to be inapplicable because the allegations in the complaint—that "financial statements had been falsified," figures had been "artificially inflated," and statements claiming "that [the company] had achieved, and would continue to achieve, substantial growth in revenue and profits"—were primarily misrepresentations. Id. at 1163. That is not the case here. The allegations in the CAC are not that Tile Shop failed to disclose the full extent of Nishi's related-party transactions or that it misrepresented Nishi's involvement with certain overseas suppliers of Tile Shop product.

14

Rather, there was no disclosure of Nishi's involvement whatsoever.  Investors had no knowledge

that Nishi had an ownership interest in companies that transacted with Tile Shop until it was

revealed by the Gotham Report.  In this context, it is illogical to conclude that something

completely omitted from a required corporate disclosure is merely "misrepresented."  To the

contrary, the allegations here are concerned with information that is omitted rather than

misrepresented.

Defendants' second argument, that the Affiliated Ute presumption has not been the sole

or principal basis to presume reliance for publicly traded companies, is not convincing.  In re

Montage Technology Group Limited Securities Litigation, a case with similar facts to those here,

held that because plaintiffs' case hinged on the omission of material information, the Affiliated

Ute presumption applied.  No. 14-722, 2016 WL 1598666, at *6–7 (N.D. Cal. April 21, 2016).

Like this case, the omission alleged in Montage was the failure to disclose related-party

transactions in the defendant company's SEC filings, which, when corrected, resulted in a sharp

drop in the price of the company's stock.[5]  Id. at *1, 7.  This, the Montage court concluded, was

sufficient for the Affiliated Ute presumption to apply.  Id. at *7.  While Montage discussed and

ultimately concluded that plaintiffs were also entitled to the fraud-on-the-market presumption,

nothing in the decision suggests that class certification would have been denied if the fraud-on-

the-market presumption had failed.

In another case, In re Smith Barney Transfer Agent Litigation, plaintiffs advanced the

Affiliated Ute presumption as the only basis for satisfying predominance.  290 F.R.D. 42, 47

(S.D.N.Y. 2013).  In that case, plaintiffs asserted claims under Section 10(b) of the Securities

---

[5] Like Tile Shop, Montage Technology Group Limited was traded on the NASDAQ.

Exchange Act of 1934 against defendant companies that provided investment management and advisory services to a group of mutual funds. Id. at 43–44.  When the funds' transfer agent's contract expired, that agent was replaced with an in-house transfer agent, who subsequently subcontracted the majority of the transfer agent work back to the original transfer agent at a significantly reduced rate. Id. at 44.  Rather than remitting the savings to the funds, the in-house transfer agent continued to charge the funds a higher rate, earning substantial profits in the process. Id.  After the enterprise was uncovered and investor lawsuits were consolidated, a class was certified using the Affiliated Ute presumption. Id. at 49.

While the facts of Smith Barney are very different from those presented here, the application of the Affiliated Ute presumption applies with equal force.  True, the corporate defendants in Smith Barney were not publicly traded.  But the reasoning that supports applying the Affiliated Ute presumption does not distinguish between public and private companies. Affiliated Ute recognizes that it is a practical impossibility for a plaintiff in a non-disclosure case to demonstrate reliance. See Joseph, 223 F.3d at 1162 ("Requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff.").  The evidentiary difficulty in these cases is not lessened merely because the defendant is a publicly traded company.  Defendants have not offered any compelling reason that justifies a material distinction between public and private companies in the context of Affiliated Ute.

### b. Fraud-on-the-Market Presumption

Plaintiffs also contend they have satisfied the fraud-on-the-market presumption, which presumes an investor's reliance on any material public misrepresentations.  Consequently, "where materially misleading statements have been disseminated into an impersonal, well-

developed market for securities, the reliance of individual plaintiffs on the integrity of the market

price may be presumed." Basic, 485 U.S. at 247.  As explained by the Seventh Circuit:

> When someone makes a false (or true) statement that adds to the supply of
> available information, that news passes to each investor through the price of the
> stock.  And since all stock trades at the same price at any one time, every investor
> effectively possesses the same supply of information.  The price both transmits
> the information and causes the loss.  This approach, dubbed the fraud-on-the-
> market doctrine, supplants "reliance" as an independent element by establishing a
> more direct method of causation.  When a company's stock trades in a large and
> efficient market, the contestable elements of the Rule 10b–5 claim reduce to
> falsehood, scienter, materiality, and loss.  Because each investor's loss usually
> can be established mechanically, common questions predominate and class
> certification is routine, if a suitable representative steps forward.

Schleicher v. Wendt, 618 F.3d 679, 682 (7th Cir. 2010) (citations omitted and emphasis in

original).

The fraud-on-the-market doctrine holds that "the market price of shares traded on well-

developed markets reflects all publicly available information, and, hence, any material

misrepresentations." Basic, 485 U.S. at 246.  Four factors are scrutinized to determine if this

rebuttable presumption applies:  "(1) that the alleged misrepresentations were publicly known,

(2) that they were material, (3) that the stock traded in an efficient market, and (4) that the

plaintiff traded the stock between the time the misrepresentations were made and when the truth

was revealed." Halliburton II 134 S. Ct. at 2408.

Here, Defendants do not contest that the allegedly undisclosed related-party transactions

were not publicly known.  Tile Shop's mandatory disclosures do not report the alleged related-

party transactions identified in the CAC.  The materiality of the omissions does need to be

proven to prevail on the merits, but such proof is not a prerequisite to class certification.  Amgen,

133 S. Ct. at 1191.  The fourth prerequisite is also not at issue.  The definition of the proposed

class ensures that the putative class members' purchases were made between when the

17

misrepresentations were made and when the truth was revealed.

Defendants do contest the third factor, whether Tile Shop stock traded in an efficient market during the proposed Class period.  To satisfy this requirement, Plaintiffs submit the expert report of Chad Coffman.  While the Eighth Circuit has not expressly adopted a specific test to determine market efficiency, Coffman considered ten factors other courts have recognized as determinative for whether a market is efficient.  The first five, called the Cammer factors are:

> (1) a stock's average weekly trading volume; (2) the number of security analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) whether the company is eligible to file an SEC Form S-3; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

Forsta AP-Fonden v. St. Jude Med., Inc., 312 F.R.D. 511, 518 (D. Minn. 2015) (citing Cammer v. Bloom, 711 F.Supp. 1264, 1286–87 (D.N.J. 1989)).[6]  Coffman also considered the so-called Krogman factors, which are:  (1) market capitalization, (2) the bid-ask spread, and (3) the "float," or "the percentage of shares held by the public, rather than insiders."  Krogman v. Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001).  Coffman additionally analyzed whether the stock exhibited "autocorrelation," meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns.  Forsta, 312 F.R.D. at 518.  Finally, great weight is given to the fact that a company is traded on a major exchange, like the NASDAQ.  See, e.g., In re Initial Public Offering Sec. Litig., 544 F. Supp. 2d 277, 296 n.133

---

[6] Defendants question the applicability of the Cammer factors, arguing that Cammer was decided less than one year after Basic, and that much has changed in the public markets since that time.  While true, courts across the country continue to apply the Cammer factors in assessing market efficiency.  See, e.g., In re Barrick Gold Sec. Litig., 314 F.R.D. 91, 101–02 (S.D.N.Y. 2016); Burges v. Bancorpsouth, Inc., No. 3-14-1564, 2016 WL 1701956, at *3 (M.D. Tenn. April 28, 2016).

(S.D.N.Y. 2008) ("the federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

Defendants challenge Coffman's conclusion that Tile Shop stock traded in an efficient market prior to May 2, 2013.  Defendants assert Coffman's analysis did not show a sufficient reaction between Tile Shop stock price and unexpected news—the factor Defendants contend must be established for a market to be deemed efficient—during the early stages of the proposed class period.  Defendants further argue that Coffman's analyses for the bid-ask spread and autocorrelation support their argument that the market was inefficient prior to May 2, 2013.  Plaintiffs respond that the stock price reaction factor is not dispositive of market efficiency, and that the overall weight of the factors used to determine market efficiency overwhelmingly compel the conclusion that Tile Shop stock traded in an efficient market throughout the class period.

Plaintiffs bear the burden of establishing market efficiency, a showing that the stock was traded on an "impersonal, well-developed market" where "most publicly available information is reflected in market price."  Basic 485 U.S. at 247.  Courts have sanctioned application of the aforementioned Cammer and Krogman factors, as well as autocorrelation and whether the stock is traded on a major exchange like the NASDAQ.  Forsta, 312 F.R.D. at 518.

Coffman concluded that four of the five Cammer factors demonstrate an efficient market throughout the class period.  The weekly trading volume of Tile Shop common stock "easily surpasses the threshold level of average weekly trading volume indicative of an efficient market."  Krypel Aff. Ex. U ("Coffman Report") ¶ 30.  The substantial analyst coverage of Tile Shop provided "evidence of a robust and active market" supporting the conclusion that the stock was "traded in an efficient market during the Class Period."  Id. ¶ 38.  The market maker and

19

SEC form S-3 eligibility factors also resolved in favor of market efficiency during the class period.  Id. ¶¶ 42, 45.

The Krogman factors and autocorrelation, according to Coffman, also supported market efficiency throughout the class period.  Coffman noted that Tile Shop's market capitalization was higher "than the majority of the companies traded in the NYSE and NASDAQ" and "thus support[ed] a finding of efficiency."  Id. ¶ 67.  Tile Shop's bid-ask spread was "low during the Class Period in both dollar and percentage terms, thus further supporting market efficiency."  Id. ¶ 71.[7]  Institutional investors held on average 93.3% of the public float, which demonstrated market efficiency.  The autocorrelation factor additionally supported market efficiency; Coffman's regression analysis confirmed "with 95% confidence that the variation in abnormal return throughout the Class Period is due to randomness," which is "inconsistent" with the idea that the stock's abnormal movements could be predicted.  Id. ¶ 76.[8]

However, on the fifth Cammer factor, price reaction to new information, Coffman concluded that the factor evidenced market efficiency only from May 2, 2013 to the end of the

_____

[7] Defendants argue that because the bid-ask spread was higher in the beginning stages of the proposed Class period than in the later, this factor supports their argument that the market was not efficient until May 2013.  This argument is unconvincing.  While Coffman did state that the bid-ask spread was higher during the beginning of the proposed class period, "it was still well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in September 2012 (the full month when Tile Shop had the largest percentage bid-ask spread)."  Coffman Report ¶ 71.

[8] Defendants also contest Coffman's conclusion on the autocorrelation factor, arguing that the regression analysis shows autocorrelation, which is evidence of non-efficiency, at the beginning of the class period.  However, as noted by Coffman and supported by caselaw, averaging across the class period is superior to isolating small portions of the class period when assessing autocorrelation.  Krypel Aff. Ex. U 128:3–12; Petrie v. Elec. Game Card, Inc., 308 F.R.D. 336, 356 (C.D. Cal. 2015).  An increased incidence of autocorrelation in the beginning of the proposed class period therefore does not provide compelling support for Defendants' argument.

class period.  According to Coffman's analyses, there is no "statistically significant stock price reaction to new information prior to May 2, 2013." Id. ¶ 65.  Defendants contend this is dispositve of market efficiency throughout the entire class period because Cammer factor five is the "essence of an efficient market and the foundation for the fraud-on-the-market theory." Teamsters Local 445 Freight Div. Pension Plan Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008).

Some courts have considered the fifth factor to be "critical," or the "essence of market efficiency."  In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig., 281 F.R.D. 174, 182 (S.D.N.Y. 2012); George, 2013 WL 3357170, at *9.  But other courts have concluded otherwise. See In re Retek Inc. Sec. Litig., 236 F.R.D. 431, 437 (D. Minn. 2006) (noting that the fifth Cammer factor " is not necessary to demonstrate market efficiency"); T. Grocery & Food Emps. Welfare Fund, 762 F.3d at 1256 ("Although many Circuit Courts have described cause-and-effect as the most important of the Cammer factors . . . Regions does not point us to any court that has adopted the unwavering evidentiary requirement it urges upon us.  Nor could it.").

The weight of authority on this issue favors Plaintiffs.  Many courts have found market efficiency without Cammer factor five resolving in the putative classes' favor.  See, e.g., Smilovits v. First Solar, Inc., 295 F.R.D. 423, 437 (D. Ariz. 2013) (finding market efficiency despite the fifth factor being neutral and "even if the fifth factor is considered most important"); Forsta, 312 F.R.D. at 520 (collecting cases).  Forsta is strong support for Plaintiffs' position. The defendants there pressed the very argument Defendants advance here, whether a putative class may invoke the fraud-on-the-market presumption without Cammer factor five weighing in their favor.  Like Coffman in the case at bar, the expert in Forsta opined that "nine of the above-cited factors support a finding of market efficiency" and the defendant company was traded on a

21

large national exchange.  Id. at 519.  In deflecting defendants' argument that the fifth Cammer

factor was needed to demonstrate market efficiency, Forsta observed that "[d]efendants ask this

Court to impose a burden on plaintiffs that the law does not mandate."  Id. at 521.

Just like in Forsta, nine of the ten factors weigh in favor of market efficiency throughout

the entire class period.  Tile Shop was and is traded on the NASDAQ, one of the most open and

fluid markets in the world.  The stock in Forsta was traded on the New York Stock Exchange, a

similarly open and fluid market.  Finally, Forsta and others have recognized that the Cammer,

Krogman, and other indicators of market efficiency are "factors," and that market efficiency is

assessed by balancing or weighing these factors.  This accepted approach contrasts with the

method Defendants urge, that one of the several "factors" is essential.  Under the Defendants'

approach, "factor" would be become a "requirement" or "necessity," a label that has not been

explicitly endorsed by the courts.

The substantial similarity of fact pattern to Forsta demands the same result.  Plaintiffs

have satisfied their burden of establishing that Tile Shop stock traded in an efficient market

during the entire class period.  Plaintiffs may invoke the fraud-on-the-market presumption to

satisfy Rule 23(b)(3)'s reliance requirement.

### c.  Causation and Damages

Defendants also argue that the Class should not be certified because Plaintiffs have not

presented a viable method of calculating damages consistent with their theory of liability.

Defendants contend that Plaintiffs have not articulated any method for disentangling Tile Shop's

allegedly corrective disclosures from other confounding information Tile Shop released around

the same time.  According to Defendants, in addition to publishing the Nishi related-party

omission, the Gotham Report disclosed other concerns about Tile Shop that did not ultimately

materialize.[9]  In response, Plaintiffs argue that the challenges Defendants raise are premature;

that what is required at the class certification stage is a showing that their damages stemmed

from Defendants' actions.  Plaintiffs submit they have satisfied this requirement.

At the class certification stage, an examination of the proposed damages methodology

must be undertaken to ensure that it is consistent with the classwide theory of liability capable of

being measured on a classwide basis.  In re U.S. Foodserv. Inc. Pricing Litig., 729 F.3d 108, 123

n.8 (2d Cir. 2013).  "Calculations need not be exact, but at the class-certification stage . . . any

model supporting a plaintiff's damages case must be consistent with its liability case. . . ."

Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (quotation marks and citation omitted).

Plaintiffs' sole theory of liability, the omission of the related-party transactions, giving

rise to their sole alleged harm, artificial stock inflation, is straightforward.[10]  Coffman stated that

"[t]he standard and well-settled formula for assessing damages for each class member under

Section 10(b) is the 'out-of-pocket' method."  Coffman Report ¶ 78.  Contrary to Defendants'

assertion, Comcast merely requires that "a model purporting to serve as evidence of damages in

[a] class action must measure only those damages attributable to that theory."  Comcast 133 S.

Ct. at 1433.  The Coffman Report satisfies what Comcast demands, that a viable calculation of

---

[9] Defendants cite the Gotham Report's prediction that Tile Shop would need to restate its financials, its gross margins would decline, and its creditors would take adverse actions—all three of which, according to Tile Shop and unrebutted by Plaintiffs, did not happen—as confounding information.

[10] In a case cited by Defendants, Sicav v. Jun Wang, plaintiffs proposed an "unusual theory of classwide injury" distinct from "a typical securities fraud class action."  No. 12-6682, 2015 WL 268855, at *2 (S.D.N.Y. Jan. 21, 2015).  That unusual theory crippled plaintiffs' certification efforts because plaintiffs' expert failed to sufficiently identify evidence that could be used to establish common injury among the class.  Id. at *3–4.  Because the theory of liability advanced here is neither unusual nor distinct from a typical securities fraud class action, Sicav lacks force.

damages can be made in this case.[11]

Finally, Defendants are incorrect that confounding information contemporaneously disclosed in the Gotham Report with the related-party omission is inimical to class certification. Concerns over disentangling loss specific to a corrective disclosure from other non-actionable announcements does not defeat predominance because Plaintiffs are not required to prove loss causation at this stage.  See Amgen, 133 S. Ct. at 1200 (noting that loss causation is a question that does not need to be addressed before a class is certified); Thorpe v. Walter Inv. Mgmt., Corp., No. 14-20880, 2016 U.S. Dist. LEXIS 33637, at *51 (S.D. Fla. Mar. 16, 2016) (dispensing of defendants' disentanglement argument because loss causation does not need to be proven at class certification); In re Barrick, 314 F.R.D. at 102 (noting that proving loss causation for Section 10(b) claims is not required for class certification).

### 3.  Definition of the Certified Proposed Class

Plaintiffs have fulfilled their burden of establishing each Rule 23(a) factor and both requirements of Rule 23(b)(3).  They are therefore entitled to certification of the following Class:  "all persons and entities who purchased or otherwise acquired Tile Shop common stock between August 22, 2012, and January 28, 2014."

## C.  The Subclass

Plaintiffs also seek to certify a Subclass consisting of "all persons and entities who purchased or otherwise acquired Tile Shop common stock pursuant and/or traceable to the prospectus and registration statement issued in connection with Tile Shop's public offering of common stock in December 2012."  Defendants argue that Plaintiffs have failed to demonstrate

---

[11] Comcast does not require that the damage calculation be performed at the class certification stage.  In re Scotts EZ Seed Litig., 304 F.R.D. 397, 414 (S.D.N.Y. 2015).

that the Subclass is sufficiently numerous or ascertainable.  Defendants additionally argue that

Plaintiffs are not adequate representatives of the Subclass.

### 1. Numerosity and Ascertainability

Defendants first argue that potential members who purchased shares "traceable to" the

allegedly defective materials issued in connection with the December 2012 public offering

should be excluded from the proposed Subclass.  Defendants premise their argument on the

difficulties of "tracing," or the ability to confirm that a security was indeed purchased pursuant

to the allegedly defective December 2012 public offering and not in the aftermarket.  Tracing

concerns arise here because Tile Shop common stock began trading on the NASDAQ in August

2012, three months prior to the December 2012 public offering.  See In re Bank of Am. Corp.

Sec. Litig., 281 F.R.D. 134, 147 (S.D.N.Y. 2012) ("[W]here shares issued under an allegedly

defective registration statement are publicly traded alongside shares already in the secondary

market from prior offerings, tracing is considerably more complicated.").  Defendants thus

contend that what remains of the proposed Subclass are those who purchased in the December

2012 public offering and suffered damages.  Defendants argue that this potential class of

investors falls short of what Rule 23(a)(1) demands.

Rule 23(a)(1) "requires only impracticability, not impossibility," of joinder.  United

States Fid. & Guar. Co. v. Lord,, 585 F.2d 860, 870 (8th Cir. 1978).  While the Eighth Circuit

has not established a threshold number of potential class members needed to satisfy numerosity

Emanuel v. Marsh, 828 F.2d 438, 444 (8th Cir. 1987), "[c]ourts in Minnesota have found that

putative class sizes of forty will support a finding of numerosity, and much smaller classes have

been certified by courts in the Eighth Circuit."  In re Uponor, Inc., F1807 Plumbing Fittings

Prods. Liab. Litig., No. 11-2247, 2012 WL 2512750, at *4 (D. Minn. June 29, 2012).[12]

A Subclass of direct purchasers will be certified.  Over 5 million shares were sold in the December 2012 public offering.  Given this high volume of trading, the number of potential direct purchasers alone is sufficiently large to satisfy Rule 23(a)(1).  See Katz v. Image Innovations Holdings, Inc., No. 06-3707, 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (stating that numerosity was met, in part, because of the "large number of potential class members"); In re China Intelligent Lighting and Elecs., Inc. Sec. Litig., No. 11-2768, 2013 WL 5789237, at *4 (C.D. Cal. Oct. 25, 2013) (same; collecting cases).[13]

The Subclass will also be comprised of aftermarket purchasers.  Defendants object to the inclusion of these purchasers for want of ascertainability, but "class members need not actually be ascertained prior to certification."  Engel v. Scully & Scully, Inc., 279 F.R.D. 117, 127 (S.D.N.Y. 2011).  "The requirement of ascertainability simply means that the description of a proposed class must be sufficiently definite 'so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  Eastwood v. S. Farm Bureau Cas. Ins. Co., 291 F.R.D. 273, 278 (W.D. Ark. 2013) (quoting 7A Charles Alan Wright et al., Federal Practice and Procedure § 1760 (3d ed. 2005)).  Unlike other cases where ascertainability concerns have stymied certification, determining whether a security purchased on the

---

[12] Other circuits presume numerosity when the class is comprised of 40 or more members.  See, e.g., Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

[13] Defendants argue that these cases provide little support for Plaintiffs because the defendants in these actions conceded that the putative class were sufficiently numerous.  Even so, courts are mandated to rigorously scrutinize proposed classes before certifying.  For example, in China Intelligent Lighting, defendants' apparent concession on numerosity did not appear to have dispositive effect on the court's conclusion that the 23(a)(1) demand was met.  2013 WL 5789237, at *3–4.

aftermarket originated from the 2012 public offering is objective; it either was or was not.  Cf. Ihrke v. N. States Power Co., 459 F.2d 566, 573 n.3 (8th Cir. 1972) (holding as unascertainable a proposed subclass comprised of "persons who because of their poverty are unable to pay for utility services" because class membership "would be impossible to determine because of the vagueness of its description") vacated due to mootness, 409 U.S. 815 (1982).[14]  This objective determination also sufficiently obviates concerns over individualized fact finding or the need to engage in voluminous mini-trials that will dominate the proceedings.[15]  On the facts alleged here, concerns about the need for a significant and independent assessment for each potential Subclass member who purchased in the aftermarket ring hollow.

Plaintiffs recognize that tracing is complicated, if not impossible, and that they may ultimately be unable to craft a methodology for determining whether a security purchased in the aftermarket was purchased pursuant to the allegedly defective December 2012 public offering. However, as other courts have noted, tracing is a merits issue that should be not be considered at this stage.  See Wallace v. IntraLinks, 302 F.R.D. 310, 319 (S.D.N.Y. 2014) (certifying subclass over defendants' argument that aftermarket purchasers should be excluded).[16]

---

[14] The Eighth Circuit, "unlike most other courts of appeals," recently declined to explicitly outline a requirement of ascertainability.  Sandusky Wellness Center, LLC v. Medtox Sci., Inc., 821 F.3d 992, 996 (8th Cir. 2016).

[15] The Third Circuit has held that "[a] plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful."  Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013).  The Third Circuit, however, imposes a heightened test for ascertainability that has not been adopted by the Eighth Circuit.  Sandusky, 812 F.3d at 996.

[16] As other courts have noted, "Defendants' argument that aftermarket purchasers will be unable to trace their purchases to the [2012 Offering] is an argument best addressed after a factual record has been developed."  In re Dynegy, Inc. Sec. Litig., 226 F.R.D. 263, 282 (S.D. Tex. 2005).

## 2. Adequacy

Defendants contend that the Counties are not adequate representatives for the Subclass for two reasons.[17]  Defendants' first and primary argument is that the Counties' alleged losses were not caused by the purported misrepresentations, but were merely the consequence of investment decisions.  According to Defendants, because the losses suffered by the Counties are not recoverable, they are ill-suited to represent the Subclass.  Plaintiffs respond that Defendants' "negative causation" argument cannot defeat class certification.

15 U.S.C. §77k(e) states:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

At least one court has concluded that this defense cannot limit a putative class at the class certification stage because it would require a merits determination that is improper at this stage in the litigation.  Dynegy, 226 F.R.D. at 283.  That reasoning is persuasive; the Eighth Circuit has directed a district court's inquiry on a class certification motion to be "tentative, preliminary, and limited."  In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 605, 613 (8th Cir. 2011).  Entertaining Defendants' negative causation argument requires a more detailed inquiry than required at this stage.

Defendants' second argument, appearing in a footnote in its opposition brief, asserts that the Counties have not met their burden of showing that they are adequate Subclass

---

[17] De Wulf did not purchase shares in the 2012 Offering so he does not have standing to assert a Section 12(a)(2) claim.

representatives.  The concern of Rule 23(a)(4) is whether a conflict of interest exists between named parties and the class they seek to represent.  Amchem, 521 U.S. at 625.  The record lacks any evidence of conflicting interests between the Counties and potential Subclass members.  Accordingly, Defendants arguments will not defeat certifying the Counties as Subclass representatives.[18]

### 3.  Remaining Factors

Defendants do not raise any additional challenges explicit to certification of the Subclass.  However, because class certification is only proper after a "rigorous" analysis, the remaining Rule 23(a) and 23(b)(3) factors will be assessed.  Wal-Mart Stores, 564 U.S. at 350–51.

#### a.  Commonality

Defendants' stipulation to satisfaction of the commonality requirement also applies to the proposed Subclass.  As was true for the Class, nothing in the record undermines the parties' agreement that "questions of law or fact [are] common to the [Sub]class."  Fed. R. Civ. P. 23(a)(2).

#### b.  Typicality

The Counties' claims are typical of the claims of the proposed Subclass.  Both of the Counties purchased Tile Shop common stock pursuant and/or traceable to the December 2012 public offering.  Defendants offer no explicit arguments challenging typicality for the proposed Subclass in addition to those raised in challenging certification of the proposed Class.  The

---

[18] Defendants again assert that Plaintiffs' failure to sell their Tile Shop shares when they were trading above the $15 per share purchase price is problematic, arguing this time that it renders Plaintiffs atypical.  As observed in the motion to dismiss, there is a lack of authority for the proposition that Plaintiffs have an affirmative duty to mitigate their damages by selling their shares for value that exceeds the purchase price.

Subclass has therefore satisfied Rule 23(a)(3).

### c. Predominance and Superiority Under Federal Rule of Civil Procedure 23(b)(3)

The proposed Subclass also satisfied both requirements of Rule 23(b)(3). Class treatment is superior to many individual lawsuits adjudicating securities claims arising from the alleged Nishi-omission. Unlike the Section 10-b claims asserted by the Class, the claims of the Subclass only require that Defendants made materially misleading statements or omissions in the December 2012 offering materials. This inquiry looks solely to Tile Shop's disclosures and in no way involves questions aimed at individual members of the proposed Subclass. Finally, damage calculations do not prevent certification of the proposed Subclass. The damage calculation for Subclass members are subject to common methodology determined by statute. Therefore, common questions cover the claims asserted by the Subclass, and the demands of Rule 23(b)(3) are met.

### 4. Conclusion of the Proposed Subclass

Plaintiffs have fulfilled their burden of establishing each Rule 23(a) factor and both requirements of Rule 23(b)(3). They are therefore entitled to certification of the following Subclass: "all persons and entities who purchased or otherwise acquired Tile Shop common stock pursuant and/or traceable to the prospectus and registration statement issued in connection with Tile Shop's public offering of common stock in December 2012."

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs' Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel [Docket No. 177] is **GRANTED**.

A class is certified as:

>All persons and entities who purchased or otherwise acquired Tile Shop common stock between August 22, 2012, and January 28, 2014; and

A subclass is certified as:

>All persons and entities who purchased or otherwise acquired Tile Shop common stock pursuant and/or traceable to the prospectus and registration statement issued in connection with Tile Shop's public offering of common stock in December 2012;

2.   Beaver County Employees' Retirement Fund, Erie County Employees' Retirement System, and Luc De Wulf are **APPOINTED** as class representatives;

3.   Beaver County Employees' Retirement Fund and Erie County Employees' Retirement System are **APPOINTED** as subclass representatives; and

4.   The law firms of Kessler Topaz Meltzer & Check, LLP, and Robbins Geller Rudman & Dowd LLP are **APPOINTED** as class counsel.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 28, 2016.